[Civ. No. 19865. First Dist., Div. Two. Apr. 30, 1962.]

JUNE SHAW HASELTINE, Plaintiff and Respondent, v. CHARLES deB. HASELTINE, Defendant and Appellant.

Robert E. Zang, David C. Bull, Severson, Zang, Werson, Berke & Larson for Defendant and Appellant.

Sullivan, Roche, Johnson & Farraher, Vincent J. Mullins and Daniel H. Dibert for Plaintiff and Respondent.

AGEE, J.—This is an appeal by defendant-husband and relates only to money and property. The parties intermarried on April 23, 1938, and separated on July 1, 1956. The wife filed suit for divorce on November 15, 1956, and on December 14, 1959, during the course of a protracted trial, was awarded an interlocutory decree of divorce on the ground of extreme cruelty. Some nine months later, on September 14, 1960, the judgment from which this appeal is taken was entered.

We will discuss the numerous points raised by appellant in the order made but, before doing so, wish to state that we have examined the record and have concluded that the trial court's findings of fact of which appellant complains are supported in each instance by substantial evidence, and we do not propose to set forth in this opinion a summary of the testimony relating thereto.

### Reimbursement of Wife's Separate Funds

Appellant was the sole owner of Pacific Stevedoring and Ballasting Company at the time of his marriage. With the exception of personal effects, certain life insurance policies, certain fully depreciated equipment and good will, his net worth at that time was $20,035.07. Respondent had substantial means. Appellant informed respondent that his business required additional capital in order to build it up. Accordingly, the parties agreed that respondent would contribute money from her separate funds to pay the community living expenses and thus allow the business to maintain a larger working capital. It was agreed that respondent was to be

credited on the books with such advances and be reimbursed therefor when it was possible to do so. Respondent's advances from January 1, 1947, until July 1, 1956, amounted to $123,575.95. This was stipulated to.

In response to the court's inquiry as to whether the parties had agreed or understood that respondent was to be reimbursed, appellant testified: "Not in so many words, your Honor. But I am sure that we both understood that that would be considered and done, if possible." The trial court, in announcing its decision, referred to this testimony and stated: "It is significant to me, because it shows what was in Mr. Haseltine's mind at the time Mrs. Haseltine was making these contributions to living expenses, . . ." Respondent testified that she and appellant "discussed my private income and that I would be making the advances to our joint account to help pay the family expenses so that he could be putting his money and what he had and as much as he could into the business to build it up. It was discussed again, probably more at length, . . . that I would continue making my contributions or my advances to the community living, and that on those books there would be a credit to my account for what I had been contributing to the family living."

The use of the word "advances" is of significance in determining whether the parties made an express agreement to reimburse respondent, because such word indicates, when used in relation to money, an agreement to reimburse the one who made the advances. (*Semi-Tropic Spiritualists' Assn.* v. *Johnson,* 163 Cal. 639, 642 [126 P. 488].)

Without further discussion, it is evident that there is sufficient evidence to sustain the trial court's finding that respondent's advances to the community expenses were made under an agreement for reimbursement.

Appellant contends that the issue of reimbursement was never raised. We need do no more than call attention to the following provision in the pretrial order: "Another serious issue at the trial will be plaintiff's demand for reimbursement for her contributions to the community over the years out of her separate funds, . . ." The issue was thus effectively made part of the record. (Rule 8.8, Rules for the Superior Courts.) What appellant really complains about is that his counsel thought that respondent intended to rely upon an agreement to reimburse implied in the law and not upon an express agreement as required. (See *Blackburn* v. *Blackburn,* 160 Cal.App.2d 301 [324 P.2d 971]; *Thomson* v. *Thomson,*

81 Cal.App. 678 [254 P. 644].) However, a party is not entitled to rely upon his pretrial expectation that a properly raised issue will be pursued upon an erroneous legal theory. The issue was fully developed by both sides during the lengthy trial and, if appellant's counsel was surprised initially, it was not for long.

The decree provided that respondent was to be "reimbursed from the community estate in the amount of $123,575.95 as set forth in said Findings of Fact and Conclusions of Law." Appellant contends that an inconsistency results when reference is made to the findings and conclusions. The findings recite that respondent is to reimburse the community in the amount of $24,396.11 for money received by her from appellant which belongs to the community. Reference has already been made to the finding that respondent advanced $123,575.95 to the community from her separate funds. The conclusions provide as follows: "Plaintiff will reimburse the community in the amount of $24,396.11. Defendant will reimburse the community in the amount of $123,575.95 which the community shall in turn reimburse and pay over to plaintiff in full. In the event the community shall fail or for any reason be unable to reimburse and pay over to plaintiff said sum of $123,575.95, defendant shall pay to plaintiff from his separate property the sum of $63,023.70."

The court then, in both the conclusions and the decree, divided the "net community property" 51 per cent to respondent and 49 per cent to appellant.

It was never the intention of the trial court to require appellant to pay the $123,575.95 into the community from his separate estate. It was fully aware of the situation which would thereby result, and stated, upon submission of the case for decision: "If I order that Mrs. Haseltine be reimbursed in full she would be getting 100% for herself. There would be 100% less of that amount left to divide." What the trial court obviously intended was that the community should reimburse respondent if it was able to do so. The "net community property" would thus be reduced by $123,575.95, and would result in a reduction of respondent's share in the said property to be divided between the parties to the extent of 51 per cent of the amount of such reduction, or the sum of $63,023.70. The trial court gave appellant the alternative of reimbursing respondent either in this manner or paying her the sum of $63,023.70 from his separate funds. We do not

find any inconsistency but if appellant does, he may choose either alternative.

## The 1954 Agreement

As of January 1, 1947, defendant withdrew approximately $27,000 in securities and cash from Pacific Stevedoring and Ballasting Company as representing his separate interest in the business. Thereafter, the business was considered and treated by the parties as being entirely community property. In 1954, defendant proposed to plaintiff that he purchase her community interest in the company, and in early 1955 an agreement was drawn up and executed, whereby defendant purchased such interest for $23,685.54, represented by a note. This amount, plus interest of $710.57, paid to plaintiff on the note, is the $24,396.11 which the court required plaintiff to return to the community.

The trial court found that the 1954 agreement was invalid. It found that the sum paid by defendant to plaintiff for her interest was greatly below the company's actual cash value, that plaintiff received no independent legal advice and was not represented by counsel during the drafting and execution of the agreement, that defendant did not disclose to plaintiff the true value of the company or the great pecuniary advantages which he would receive by virtue of the agreement, that defendant represented that the sum paid plaintiff was equal to one-half of the company's net worth and that this was not adequate compensation for plaintiff's interest, that defendant did not disclose to plaintiff the fact that certain items of deferred income were carried on the company's books as a charge against assets in computing net worth, and that defendant did not disclose to plaintiff that at the time of their agreement he had arranged for the sale of part of the company's assets for a sum equal to three times the amount paid plaintiff for her interest. Upon these findings the court concluded that plaintiff had not been divested of her interest in the business and accordingly rendered judgment that Pacific Stevedoring and Ballasting Company was still the community property of the parties.

Defendant first contends that the validity of the 1954 agreement was never made an issue at the trial. His attack is levied against a trial amendment of plaintiff's complaint, which specifically sought relief from the agreement. Before reaching this contention, we note that over a year prior to her trial amendment, shortly after the pretrial conference order was filed, plaintiff alleged by amendment to her com-

plaint that Pacific Stevedoring and Ballasting Company was community property. Prior to that, defendant had by cross-complaint sought to restrain plaintiff's alleged attempt to repudiate "certain valid agreements" made by the parties during the marriage. Such allegations were sufficient, we think, to raise an issue as to the status of Pacific Stevedoring and Ballasting Company and as to the validity of any agreements respecting its status. Were this not so, nothing precluded the trial court from broadening the issues so as to effect a complete determination of all matters disputed by the parties. "In a divorce proceeding, however, issues may be broadened at the trial to include questions not made an issue by the pleadings and, where the entire controversy as to disposition of the community property is submitted to the court, it may make a fair disposition of the property rights in consonance with the law and a general accounting." (*Auclair* v. *Auclair* (1946) 72 Cal.App.2d 791, 802 [165 P.2d 527].)

Defendant contends that plaintiff's alleged cause of action for rescission was barred by the statute of limitations, that plaintiff failed to comply with Civil Code section 1691 which requires prompt notification for a rescission and an offer of restoration, that plaintiff's failure to rescind promptly operated as a ratification of the 1954 agreement and an estoppel to assert her rights, and that the cause of action for rescission was defectively pleaded.

 Assuming that plaintiff's trial amendment raised any matters not comprehended in the prior pleadings, those allegations which are here relevant added, as will be noted, no more than a change in legal theory or in the remedy sought. It is well settled that such an amendment is deemed to have been filed as of the date of the original complaint. The original complaint was filed November 15, 1956, less than two years after the date of the 1954 agreement. Assuming *arguendo* that the statute of limitations was applicable, it does not bar the amendment in the instant case. (*Eichler Homes of San Mateo, Inc.* v. *Superior Court* (1961) 55 Cal.2d 845, 847 [13 Cal.Rptr. 194, 361 P.2d 914]; *Taylor* v. *Marine Cooks & Stewards Assn.* (1953) 117 Cal.App.2d 556 [256 P.2d 595]; *Wennerholm* v. *Stanford University School of Medicine* (1942) 20 Cal.2d 713 [128 P.2d 522, 141 A.L.R. 1358]; *Vallera* v. *Vallera* (1944) 64 Cal.App.2d 266 [148 P.2d 694]; *Ben-Hur Mfg. Co.* v. *Empire Factors* (1960) 181 Cal.App.2d 123, 131 [5 Cal.Rptr. 181].)

■ The amended pleading makes patent the fact that plaintiff did not purport to plead or prove rights based solely upon Civil Code sections 1689-1691. The amendment alleged that defendant had obtained plaintiff's signature to the 1954 agreement by "fraud, duress, undue influence, mistake of fact *and a breach of the confidential relationship and fiduciary duty existing between husband and wife.*" (Emphasis added.) It prayed for "rescission of said instrument and for any other relief which to the Court seems just." Defendant's contentions, and his further argument that this court cannot remedy by inference the trial court's failure to render findings relative to the question whether rescission was made an issue at trial, ignore the basis of the trial court's decision. On page 653 of the clerk's transcript on appeal, the trial court's minute order reveals that the 1954 agreement was "void and invalid for the reason that the defendant violated his fiduciary relationship to the plaintiff in connection therewith."

Section 158 of the Civil Code provides: "Either husband or wife may enter into any engagement or transaction with the other, or with any other person, respecting property, which either might if unmarried; subject, in transactions between themselves, to the general rules which control the actions of persons occupying the confidential relations with each other, as defined by the title on trusts." The measure of the husband's fiduciary obligation to his wife is set forth in Civil Code sections 2228-2234, and has frequently been enunciated. (*Vai* v. *Bank of America* (1961) 56 Cal.2d 329 [15 Cal.Rptr. 71, 364 P.2d 247]; *Weil* v. *Weil* (1951) 37 Cal.2d 770 [236 P.2d 159]; *Coons* v. *Henry* (1960) 186 Cal. App.2d 512 [9 Cal.Rptr. 258].) ■ The duty is no less than that summarized by the court in *Auclair* v. *Auclair, supra*: "The right of a husband or wife to enter into engagements with the other is subject to the general rules which control the actions of persons occupying confidential relations with each other, as in trusts. The relation is declared to be confidential and all transactions between them respecting property are made subject to the same rules that control a trustee. The least overreaching or misrepresentation by a husband through which he gains the property of his wife is fraudulent and will justify an action to avoid a settlement." ■ There can be no doubt but that, measured by this standard, the findings of the trial court fully support its determination that the 1954 agreement was void and of no force and effect.

■ Defendant contends that the evidence proves con-

clusively that plaintiff was represented by independent legal counsel at the time the 1954 agreement was negotiated. Plaintiff testified that she was not. The court found this to be the fact. While the evidence was conflicting, a determination to the contrary of the court's finding would be of little avail to defendant. In *Vai* v. *Bank of America* (1961) 56 Cal.2d 329, 339-340 [15 Cal.Rptr. 71, 364 P.2d 247], the Supreme Court ruled that the fact that the wife has received independent legal advice does not relieve her husband of his fiduciary obligation toward her in such circumstances, since to so rule ''would 'permit the authority of the husband in controlling the community property, given him in the interest of greater freedom in its use and for its transfer for the benefit of both himself and his wife, to become a weapon to be used by him to rob her of every vestige of interest in the community property with which the law has expressly invested her. Such a conclusion would violate every sense of justice, and outrage every principle of fair dealing known to the law.' (*Provost* v. *Provost*, 102 Cal.App. 775, 781 [283 P. 842].)''

Defendant also urges that his testimony shows that he had made full and complete disclosure to plaintiff of all facts respecting the 1954 agreement. Plaintiff testified that she had no business experience, but that she had faith that defendant would protect her interests, and relied upon him; that he told her that the agreement was fair to her; that he did not inform her that the agreement would yield him a financial advantage over that which she received under the agreement. There was uncontradicted evidence that at the time of the agreement defendant had effected an oral contract for the sale of company equipment for approximately $97,000, of which approximately $63,000 was outstanding at the time of the agreement. The testimony adduced on defendant's behalf did, indeed, strongly contradict that of plaintiff in many respects. The court resolved the conflict in plaintiff's favor, finding that there had not been a full disclosure. There is substantial evidence to support the court's findings. This being so, this court should not overturn them on appeal. (*Primm* v. *Primm* (1956) 46 Cal.2d 690 [299 P.2d 231] ; *Weil* v. *Weil* (1951) 37 Cal.2d 770, 788 [236 P.2d 159] ; *Coons* v. *Henry, supra.*)

Defendant's final contention with respect to the evidence presented on this issue consists of an attempt to rationalize his purchase of plaintiff's one-half interest in Pacific Stevedoring and Ballasting Company for approximately $23,000 with the fact that in the following year the business had an

income of over $130,000. While his argument may be plausible, it is one which should have been, and no doubt was, directed to the trial court instead of to this court.

### DID THE BUSINESS BECOME COMMUNITY PROPERTY?

The trial court found: "By virtue of the contributions by plaintiff, as described in the preceding paragraph, defendant was thereby enabled to retain moneys that permitted the Pacific Stevedoring & Ballasting Company to expand its operation. For the purpose of minimizing the tax impact on the earnings and profits of the Pacific Stevedoring & Ballasting Company, defendant began after marriage to withdraw his separate capital therefrom so that the remaining capital and the income realized therefrom would be the community property of the parties. As of January 1, 1947, defendant had withdrawn his entire separate capital from Pacific Stevedoring & Ballasting Company, and from and after that date, the entire remaining capital of said company was the community property of the parties."

This finding was supported by the testimony of defendant himself, his income tax returns, his business records and books, and plaintiff's own testimony. Defendant stated in his income tax return for the year 1947: "For the reason that the husband has withdrawn the entire amount of his separate capital and the only capital remaining in the business is community capital, this schedule [re husband's separate income] will be discontinued until such time as separate capital is again contributed." Defendant testified that he never thereafter contributed any separate capital to the business. Plaintiff testified that defendant told her that "it will be our business and this will be a partnership." Defendant testified that he agreed to the business becoming community property.

The law is clear that a husband and wife may by agreement transmute their separate property into community property. (Civ. Code, § 158; *Woods* v. *Security-First Nat. Bank* (1956) 46 Cal.2d 697 [299 P.2d 657]; *Tomaier* v. *Tomaier* (1944) 23 Cal.2d 754 [146 P.2d 905]; see Witkin, Summary of Cal. Law, Community Property, §§ 47 et seq.) It may be done by oral agreement (*Schwab* v. *Schwab* (1959) 168 Cal.App.2d 20 [335 P.2d 174]; *Tomaier* v. *Tomaier, supra*), no particular formalities being necessary (*Estate of Raphael* (1949) 91 Cal.App.2d 931 [206 P.2d 391]; *Faust* v. *Faust* (1949) 91 Cal.App.2d 304 [204 P.2d 906]). Where the parties agree that property shall be considered community property that is sufficient to so create it. (*Estate*

*of Sehabiague* (1941) 47 Cal.App.2d 793 [119 P.2d 30].) ▪▪▪ "All that is required to show an executed oral agreement of transmutation is proof of the parties' acts and conduct in dealing with their property." (*Estate of Raphael, supra,* p. 939; see also *Lawatch* v. *Lawatch* (1958) 161 Cal. App.2d 780 [327 P.2d 603] ; *Linville* v. *Linville* (1959) 132 Cal.App.2d 800 [283 P.2d 34].) Whether from such conduct and acts a transmutation has been effected is a question for the trier of fact. (*Linville* v. *Linville, supra; Estate of Sehabiague, supra.*) ▪▪▪ Defendant's income tax return for 1947 specifically indicated treatment of the company as community. This is competent evidence of a transmutation. (*Lawatch* v. *Lawatch, supra; Estate of Raphael, supra.*)

Defendant argues that the trial court could not accept just those parts of the business records which favored plaintiff's position and reject the parts which supported defendant's. The trial court was not so restricted. The admissions in the books that the business was community property from and after January 1, 1947, are consistent with the other evidence on this issue which was found by the court to be true. On the other hand, the "net worth" of the business as of December 31, 1954, as shown in the books, was found to be greatly below its actual value. The 1954 agreement provided that defendant was to pay plaintiff one-half of such "net worth" for her community share in the business and this is one of the grounds upon which the trial court concluded that defendant had overreached the plaintiff.

Defendant contends that, if plaintiff insists on attacking part of the business records and adopting other parts, he should be allowed to recast such records in their entirety and compute the respective interests of the parties in the business in the light of community property law as set forth in his brief. The trial court, of course, had to rule on what *had* been done and not what *might* have been done. Defendant's contention requires no further discussion.

We hold that there is substantial evidence to support the trial court's finding and conclusion that the parties agreed that the business was to be their community property.

### Failure to Award Expenses of Proving Requested Admissions

▪▪▪ Prior to the trial, the defendant submitted to plaintiff a list of 27 requests for admissions, with related interrogatories. Plaintiff admitted the truth of four of the re-

quested matters and denied the truth of the remaining 23. Defendant sought in the court below an order requiring reimbursement for expenses incurred in proving the matters denied. The trial court refused to so order, finding that there were good reasons for plaintiff's denial of the matters which defendant requested she admit. Section 2033 of the Code of Civil Procedure provides that a party served with requests for admissions may deny as well as admit the matters requested. Section 2034, subdivision (c) of the Code of Civil Procedure provides that if a party, after being served with a request for admissions of truth of any matter of fact, serves a sworn denial thereof and the other party later proves the truth of any such matter, he may apply to the court in the same action for an order requiring repayment of reasonable expenses thereby incurred. *"If the court finds there were no good reasons for the denial and that the admissions sought were of substantial importance, the order shall be made"* (emphasis added).

Defendant now challenges the trial court's finding of good cause for plaintiff's denial of the requested matters. Patently, the rule in question is mandatory in the absence of good cause. However, defendant's challenge here is of the trial court's discretionary power to find that good cause existed. The inquiry on appeal is, therefore, circumscribed by the limitations upon the power of appellate courts to disturb an exercise of discretion by the trial court. (See *Greyhound Corp* v. *Superior Court* (1961) 56 Cal.2d 355 [15 Cal.Rptr. 90, 364 P.2d 266], at pp. 379, 380.) An abuse of discretion must be shown.

In responding to the requests, plaintiff admitted that defendant owned and operated Pacific Stevedoring and Ballasting Company as his separate property at the date of marriage, that an attached exhibit showing the parties' income tax payment was accurate, that the 1954 agreement was executed by the parties and the signatures thereon genuine, and that certain real property was held of record by the parties as joint tenants. She denied a request to admit that funds advanced from her separate estate were voluntary contributions with no agreement for repayment. The court explicitly found in accordance with that denial. Many of the requests, defendant concedes, sought admissions as to the authenticity and truth of matters related in summaries made up from the parties' books by the accounting firm employed by defendant to establish a bookkeeping system. The trial court specifically found that a survey of prior transactions upon the basis of which

the books were created was based upon statements of defendant and upon his previously maintained accounts and records, which did not reflect the contributions to living expenses made by plaintiff, and as to which the accounting firm made no audit.

Manifestly, the trial court did not abuse its discretion in finding that plaintiff had good cause for her denials. The fact that matters denied were subsequently proved by uncontradicted evidence, if true, does not make the denial unreasonable per se, in retrospect. The difference between an admission and a denial is measured by the burden of proof involved in sustaining the affirmative of the issues as to which admissions were requested.

In the instant case, key issues were presented regarding the validity of the characterizations reflected in the parties' books, and the status of the books themselves. The issues raised were hotly contested and difficult to resolve, the record reflecting that the court repeatedly sought the argument of counsel as an aid in reaching toward an equitable result. Many of the requests and related interrogatories intruded into the midst of these controversies. Requests for admissions are not instruments of discovery. ''Section 2033, like its counterpart Federal Rule 36, contains closely knit provisions calculated to compel admissions *as to all things that cannot reasonably be controverted.*'' (Emphasis added; Louisell, *Discovery Today* (1957) 45 Cal. L. Rev. 486, 505.) Upon our review of the record, we are unable to say that the trial court abused its discretion in determining that plaintiff's denials were made for good reasons.

### Post-1954 Transmutation Agreements

The trial court found that one group of securities which were listed as defendant's separate property were purchased after 1954, with funds derived from Pacific Stevedoring and Ballasting Company or other community held bank accounts. It held that these securities were community property. Defendant concedes that certain of the securities were originally purchased with community funds but contends that they became his separate property by virtue of an agreement between the parties, a matter which defendant says the trial court failed to comprehend.

We find in the record no evidence of such an agreement, and defendant's citations to the record revealed none. There

was evidence that, prior to 1954, at the end of each year one of the parties, usually defendant, withdrew from Pacific Stevedoring and Ballasting Company to his separate estate an amount which would equalize the total withdrawals by both during the year. Defendant contends that the transfer of these securities to his separate estate on December 31, 1955, was made under just such an agreement with the plaintiff. In support of his argument, defendant points to the fact that the court upheld those pre-1954 agreements. This fact is not borne out by the record. It discloses the court's decree that the parties retain sums withdrawn from Pacific Stevedoring and Ballasting Company from January 1, 1947, until December 31, 1954. The former date was that upon which the court found Pacific Stevedoring and Ballasting Company to have become community property; the latter is the effective date of the invalid 1954 agreement. However, the court's decree with respect to the 1947-1954 withdrawals was not based upon a finding of transmutation agreements. The parties had previously stipulated that the community property might be awarded plaintiff in an amount not to exceed 51 per cent. The record makes clear that in allowing retention of pre-1954 withdrawals, the court was exercising its power to allocate the community estate, upon the clearly expressed ground that "beginning January 1, 1947, ending December 31, 1954, both drew out equal amounts . . . therefore, each will retain that which they drew out from the company, because they were about equal, up to and as of December 31, 1954." Defendant's citations to the record do not disclose evidence of the 1955 agreement which he asserts; so far as we can ascertain from the record there was no such evidence presented; and there were no findings by the trial court as to the existence of valid pre-1954 agreements or that the 1955 transfer was made in pursuance of such an agreement. The finding is that the securities in question were community property. It is incumbent upon the challenger of a trial court's findings to demonstrate to the reviewing court wherein the trial court erred. (*Bird* v. *Bird* (1960) 180 Cal.App.2d 188, 192 [4 Cal.Rptr. 290]; *Greenstone* v. *Claretian Theological Seminary* (1959) 173 Cal.App.2d 21, 35 [343 P.2d 161]; *Richard* v. *Richard* (1954) 123 Cal.App.2d 900, 902 [267 P.2d 867].) This burden defendant has failed to sustain.

Defendant also contends that the matter must be resolved in his favor on the basis of a stipulation entered into at the trial. From the record it appears that plaintiff at one point

during the trial sought to adduce evidence that defendant had on December 31, 1955, transferred these securities from the community books to his separate accounts at a cost value of $28,106.78, while the securities had an actual market value of $31,195. This evidence was offered to show defendant's overreaching of plaintiff. Defendant's counsel interposed to state that there was no controversy as to that, and to offer a stipulation that defendant would pay over the difference in these amounts. Thereupon the following took place: ''MR. MULLINS [attorney for plaintiff] : The stipulation is that the transfer was made on December 31, 1955, of these stocks? . . . That he transferred to his separate account on December 31, 1955, at a cost basis, stocks which had a value in excess of the cost basis by the amount of . . . [$3,719.22, as determined in the ensuing discussion].'' The stipulation was then accepted by plaintiff and affirmed by defendant. Defendant now contends that by this stipulation plaintiff ratified and confirmed the transaction by which defendant received title to the securities. Stipulations constitute valid agreements between the parties on whose behalf they are made. (*Bordin* v. *Bordin* (1961) 193 Cal.App.2d 132, 134 [13 Cal.Rptr. 837] ; *Barendregt* v. *Downing* (1959) 175 Cal.App.2d 733, 735-36 [346 P.2d 870].) As such, the usual rules of construction apply in determining their import. (*Miles & Sons, Inc.* v. *Superior Court* (1960) 181 Cal.App.2d 151, 153 [5 Cal.Rptr. 73] ; *Los Angeles City School Dist.* v. *Landier Inv. Co.* (1960) 177 Cal.App.2d 744, 751 [2 Cal.Rptr. 662].) They may not be broadened by construction to include matters not agreed upon by the parties. This stipulation is not susceptible to the construction that its terms comprehended resolution of the validity of any agreement under which the securities were transferred to defendant's separate estate. The validity of the transaction was not then in issue. The stipulation purports to show clearly and simply that the fact of the transfer for less than actual value was in accord with the attempted proof of another instance of overreaching by defendant. We conclude that there is no merit in defendant's contention.

### THE RESTRAINING ORDER

A temporary restraining order prohibiting disposal of property was granted ex parte on November 15, 1956, and an order to show cause was issued thereon, returnable eleven days later instead of within ten days as required by section 527 of the Code of Civil Procedure. However, the matter

was continued three times without objection and on December 12, 1956, the parties presented a written stipulation to the court providing that defendant could have access to certain funds and that the restraining order, as modified by the stipulation, should remain in full force and effect. The court made its order affirming the stipulation on the same date. As a result, no hearing was ever held upon the order to show cause.

Various motions were thereafter made to modify the restraining order. It thus appears that both parties acted upon the assumption that the stipulation and order of December 12, 1956, supplanted the original temporary restraining order. The result was the same as though the parties had stipulated to the original restraining order, as modified, and waived the hearing provided for by section 527.

Defendant next contends that if the restraining order were valid, it nevertheless should have been dissolved at the conclusion of the trial upon plaintiff's failure therein to establish the facts from which the court deduced that irreparable injury would result if the requested restraints were not imposed. The basis upon which the trial court continued the restraining order in effect until final judgment is reflected in the record. The trial court stated: "The petition . . . to modify the restraining order . . . is denied. I might say in passing that, until this matter is final, it is fraught with too much danger and peril to allow Mr. Haseltine, who is now a non-resident of this State, who has the control and management of the community personal property, to remove that restraining order giving him the opportunity to do things that he could, as distinguished from what he would do perhaps, is fraught with too much danger. In other words, those orders, and each of them, will remain in full force and effect until the further order of the Court."

The action of a trial court in granting, denying, dissolving or refusing to dissolve a permanent or preliminary injunction is a matter within its own sound discretion (*Union Interchange, Inc.* v. *Savage* (1959) 52 Cal.2d 601 [342 P.2d 249]), and will not be disturbed on appeal in the absence of a clear showing that the court abused its discretion. (*Flavio* v. *McKenzie* (1960) 177 Cal.App.2d 274 [2 Cal.Rptr. 79]; *Ingrassia* v. *Bailey* (1959) 172 Cal.App.2d 117 [341 P.2d 370].) The record discloses that the trial court acted well within the bounds prescribed.

CHILD SUPPORT

 The parties had two sons, born August 19, 1939, and January 10, 1941. On May 12, 1958, a pendente lite order was made that defendant pay to plaintiff $1,000 per month "as and for the support and maintenance of said plaintiff and the minor children of the parties."

On October 19, 1959, defendant made application to eliminate such support payments. Respective counsel stipulated that whatever order was made with respect thereto could be made *nunc pro tunc* as of that date. No hearing was held at the time.

On December 4, 1959, during the progress of the trial, appellant's counsel proposed and respondent's counsel accepted the following stipulation: "And, Mr. Haseltine will pay the support of Arthur [younger son], and to the extent that the support of Charles is not covered by his navy earnings, will pay the support of that son as well; that it will not be necessary for this Court to make any designated amount or order which Mr. Haseltine is to pay in dollar amounts, but that he will pay directly for the support of these two children, reserving to Mrs. Haseltine, at any time, the right to come to this Court to petition for a child support allowance in the event that she feels that the children are not being adequately supported by Mr. Haseltine."

On December 14, 1959, both sides rested without a hearing being had as to defendant's application of October 19, 1959.

On April 19, 1960, pursuant to stipulation by counsel, the case was reopened for the purpose of taking respondent's testimony as to the additional expense involved in having the children at her home in Ross on weekends and vacations. The older son was stationed at Alameda and the younger son was attending the University of Nevada. The court thereupon made the following order: "The present pending order, whereby Mr. Haseltine is to pay $1,000 per month for the support and maintenance of the plaintiff and the minor children, will be modified as of October 19, 1959, so as to require Mr. Haseltine to pay $250.00 per month for the support of the minor children. . . . This will be the order, nunc pro tunc, as of October 19, 1959, *until the further order of the Court*" (emphasis ours). The court did not abuse its discretion in making such order and, apparently, appellant did not at that time contend to the contrary.

On July 26, 1960, the trial court signed its findings of fact

and conclusions of law, which were "approved as to form" by appellant's counsel. The findings contain the following: "The parties have stipulated that the care, custody and control of the minor children shall be with defendant, subject to further order of Court and subject to plaintiff's right to visitation. . . . Defendant has adequate means to pay for the support of the minor children. The Court further finds that since October 19, 1959, the sum of $250.00 per month is a fair and reasonable amount to be allowed to plaintiff for the support and maintenance of the minor children of the parties, subject to the further order of the Court."

The conclusions provide: "Pursuant to stipulation of the parties, the care, custody and control of the minor children shall be in defendant, subject to further order of court and subject to plaintiff's right to visitation. . . . The present order with reference to alimony and child support is reduced so that defendant shall pay no alimony to plaintiff, but shall pay for the support of the minor children during their minority, all subject to further order of the court."

The judgment was signed on September 14, 1960. It provides as follows: "Custody of the minor children of the parties is awarded to defendant and cross-complainant, in accordance with the stipulation of the parties. Defendant and cross-complainant is ordered to pay for the support of the minor children, *in accordance with the stipulation of the parties*" (italics added).

It is evident that the court is referring not only to the stipulation of December 4, 1959, but also to the stipulation of April 19, 1960, whereby the case was reopened for the very purpose of determining how much defendant should pay to plaintiff to defray the additional expenses occasioned by the children's visits to her home. If this was not the intent of the parties, why did not appellant's counsel object to the hearing on April 19, 1960, on the ground that the parties had disposed of the issue by the stipulation of December 4, 1959?

We hold that the judgment did not and was not intended to modify or set aside the order of April 19, 1960, but instead incorporated it by reference in the manner above described. Defendant has never moved to modify the judgment in this respect, although his duty with relation thereto terminated as each child reached his majority. (*Wilkins* v. *Wilkins*, 95 Cal.App.2d 605, 607 [213 P.2d 748] ; *Hale* v. *Hale*, 6 Cal.App. 2d 661, 663 [45 P.2d 246].)

MISCELLANEOUS

Defendant's remaining contentions on appeal may be dealt with as they are posed, summarily. The contention is made that since plaintiff failed to prove her title or the source of acquisition of her separate property the presumption must be indulged that the securities composing that estate are community property. The answer is that the record does not disclose, nor does defendant, that an issue as to the character of the property constituting plaintiff's separate estate was ever tendered by the pleadings or proof. We are pointed to nothing in the record which indicates that the court acquired jurisdiction to determine the validity of plaintiff's title to her separate property. (See Witkin, Summary of Cal. Law, Community Property, § 72, p. 2771.) To the contrary, defendant sought at the trial to prove the magnitude of her separate estate, rather than challenge its title. The contention is without merit.

The trial court found that certain of defendant's obligations, totaling $10,571.47, were chargeable against the community property. However, the court further ordered that each party should bear his or her own attorney's fees, accountants' fees and costs of suit from their respective separate estates. This is a matter of discretion and no abuse thereof has been shown. (See 16 Cal.Jur.2d, Divorce and Separation, § 192, "Object of Allowance," and § 195, "Financial Condition of Parties.") Each party had ample separate property from which to pay these expenses.

Defendant seeks to avoid this result, stating that he "contracted the debts as manager of the community property and the community estate was liable for them." However, this was but an attempt by defendant to obtain something by indirection which he could not do directly. It is significant that no legal authority is cited which supports this contention.

The judgment is affirmed.

Kaufman, P. J., and Shoemaker, J., concurred.

A petition for a rehearing was denied May 16, 1962, and appellant's petition for a hearing by the Supreme Court was denied June 27, 1962.