[Civ. No. 10384. Third Dist. Mar. 11, 1963.]

ROSE MARIE FRITSCHI, Plaintiff and Appellant, v. MARIE SYLVERA TEED, Defendant and Respondent.

SUN LIFE ASSURANCE COMPANY OF CANADA, Plaintiff v. MARIE SYLVERA TEED, Defendant, Cross-complainant and Respondent; ROSE MARIE FRITSCHI et al., Defendants, Cross-defendants and Appellants.

MASSACHUSETTS MUTUAL LIFE INSURANCE COMPANY, Plaintiff, v. MARIE SYLVERA TEED, Defendant and Respondent; ROSE MARIE FRITSCHI et al., Defendants and Appellants.

(Consolidated Cases.)

Morton L. Friedman for Appellants.

McAllister & Johnson and Neil R. McAllister, Jr., for Respondent.

No appearance for Plaintiffs.

FRIEDMAN, J.—The present litigation represents one

720

phase of the same hostilities which produced our decision in *Estate of Fritschi*, *(Cal.App.) 28 Cal.Rptr. 86. Plaintiff Rose Marie Fritschi and Dr. Fritschi had married in 1934 and received an interlocutory decree of divorce in April 1958. At the time of their divorce they were the parents of two teen-age sons. For several years preceding the divorce Dr. Fritschi had been engaged in an affair with defendant Marie Teed. The Fritschi divorce proceedings were contested. They culminated in an interlocutory decree signed and entered on April 23, 1958. The decree awarded a divorce to Mrs. Fritschi and granted her custody of the two sons. Dr. Fritschi was directed to pay $900 per month alimony and $350 per month child support.

One paragraph of the interlocutory decree stated that Mrs. Fritschi "be, and she is hereby, awarded" certain described items of community property including the family residence and its furnishings, an automobile, and shares of stock. Another paragraph declared that Dr. Fritschi "be, and he is hereby, awarded" specified items of community property including several parcels of real estate, insurance policies on his own life, and:

"Medical practice of Ulrich A. Fritschi, M.D., including all furniture, fixtures and equipment pertaining thereto, accounts receivable, medical library, and interest in orthoptic laboratory furniture, equipment and supplies; . . ."

The interlocutory decree also contained the usual provisions for entry of a final decree at the expiration of one year "and the Court shall grant such other and further relief as may be necessary to a complete disposition of this action."

After the interlocutory decree Dr. Fritschi and Mrs. Teed commenced living together with the intention of marrying as soon as his divorce became final. Before his divorce he had given Mrs. Teed some gifts and now there were additional gifts. They purchased a building lot in Evergreen Estates, Sacramento. The price was $4,575, of which Mrs. Teed contributed $1,400 of her own funds and Dr. Fritschi contributed $3,175. Title was taken in Mrs. Teed's name. Changing their minds about building on that lot, they bought a home on Columbia Drive, Sacramento. Dr. Fritschi made initial payments aggregating $5,000 and made several monthly payments of $350

*A hearing was granted by the Supreme Court on April 1, 1963. The final opinion of that court is reported in 60 Cal.2d — [33 Cal.Rptr. 264, 384 P. 2d 656].

on this home. Title stood in Mrs. Teed's name. They intended to refinance the house and to take title in both their names when they married. Dr. Fritschi, his elderly mother, and Mrs. Teed moved into the house. He bought furniture, including a piano. In March 1959 he gave Mrs. Teed $5,000 for the use of her and his mother.

One of the items of community property awarded to Dr. Fritschi by the interlocutory decree of divorce was an insurance policy for $10,000 issued by Sun Life Assurance Company. After the interlocutory decree he designated Mrs. Teed as beneficiary of this policy. In July 1958 he took out a $25,000 policy with Massachusetts Mutual Life Insurance Company. Originally designating the estate as beneficiary, he made Mrs. Teed the beneficiary of this policy in January 1959.

During the 12 months following the interlocutory decree Dr. Fritschi's net income from his medical practice was approximately $47,000. During the same period he received approximately $40,000 from other sources such as loan repayments, sales proceeds of real estate, surrender of life insurance policies, and disability payments. During this period he paid Mrs. Fritschi approximately $17,000, mostly as alimony and child support. His earnings were mingled with other receipts with little or no regard for their origin, and his expenditures, regardless of objective, seem to have been made from commingled funds.

Either Doctor or Mrs. Fritschi would have been eligible for a final decree of divorce on April 24, 1959. In January 1959 Dr. Fritschi entered the hospital, apparently afflicted with an incurable ailment. On April 5, 1959, he died.

Three separate lawsuits have been consolidated for the purpose of this appeal. In the first action Mrs. Fritschi sues Mrs. Teed for one-half the value of assets given her by Dr. Fritschi before and after the interlocutory decree. These assets, Mrs. Fritschi alleges, had their source in community funds and were given away without her consent. The second suit is an interpleader action filed by Sun Life Assurance Company to adjudicate conflicting claims of Mrs. Fritschi and Mrs. Teed upon the $10,000 life insurance policy issued by that company. On September 15, 1958, Dr. Fritschi paid an annual premium of $364 on this policy. Mrs. Teed's claim to the proceeds is founded upon her status as beneficiary at the time of the insured's death. Mrs. Fritschi claims the proceeds for herself and her two sons, contending that Dr. Frit-

schi was of unsound mind and acting under undue influence at the time he designated Mrs. Teed as beneficiary and alleging also that the policy is community property.

The third suit was filed by Massachusetts Mutual Life Insurance Company to determine the parties' conflicting claims to the $25,000 insurance policy issued by that company. Mrs. Fritschi claims the proceeds for herself and her two sons on the theory that the two premium payments ($142.67 in July 1958 and $508.94 in March 1959) were made from community funds and on allegations of unsound mind and undue influence.

Mrs. Fritschi's claim rests in part upon the contention that the interlocutory decree was not an immediate distribution of marital property; rather it was prospective only, to be operative upon entry of the final decree; thus the marital property never lost its community character, and she, the widow, is entitled to recover half of any gifts and half the proceeds of life insurance purchased with community funds. She also argues that gifts and insurance premium payments made after the interlocutory decree had their source in commingled funds, derived partly from Dr. Fritschi's earnings. At the time of these events a husband's earnings following an interlocutory decree of divorce were community property.* (*Brown* v. *Brown,* 170 Cal. 1 [147 P. 1168].) Mrs. Fritschi contends that in the absence of evidence to the contrary, payments made from the commingled funds are presumed to have a community character. She then points to the rule that a widow may avoid one-half of a gift of community property made by her husband without her consent; and to the corollary that a widow is entitled to one-half the proceeds of life insurance, premiums for which were paid from community assets without her consent.

From a judgment in Mrs. Teed's favor in all three actions Mrs. Fritschi appeals on behalf of herself and her sons. Pivotal to the trial court's decision was its appraisal of the interlocutory decree and its effect on the property and funds from which Dr. Fritschi made the payments now under attack. We agree with that appraisal.

Plaintiff Mrs. Fritschi correctly concedes that the divorce court had power, that is, jurisdiction, to render an interlocutory decree immediately distributing the community property. (*Leupe* v. *Leupe,* 21 Cal.2d 145, 148-149 [130 P.2d 697]; *Darter* v. *Magnussen,* 172 Cal.App.2d 714, 718-720 [342 P.2d 528].) She contends, however, that the interlocu-

tory decree of divorce in this case did not do so and cannot be so interpreted. In this connection she relies upon *Johnston* v. *Johnston,* 106 Cal.App.2d 775 [236 P.2d 212]. That case expresses the view that if the interlocutory decree includes a provision for grant of further relief at the time of entry of the final decree, it will be construed not as an immediate disposition of community property but as a determination of the manner in which the property will be distributed by the final decree. As we have noted, the Fritschi decree does indeed contain a provision for further relief at the time of the final decree.

It has been said that final distribution of marital property should await the final decree; that an interlocutory decree should not attempt an immediate disposition of property. (*Dallman* v. *Dallman,* 164 Cal.App.2d 815, 819-820 [331 P.2d 245]; *Johnston* v. *Johnston,* 106 Cal.App.2d 775, 781 [236 P.2d 212]; *Waters* v. *Waters,* 75 Cal.App.2d 265, 270 [170 P.2d 494]; additional cases cited in *Leupe* v. *Leupe, supra,* 21 Cal.2d at 149.) From the hortatory expression that an interlocutory decree *should not* attempt a final property distribution, several decisions infer that such an action is error, that is, necessarily erroneous. (*Gudelj* v. *Gudelj,* 41 Cal.2d 202 [259 P.2d 656]; *Waters* v. *Waters,* 75 Cal.App.2d 265 [170 P.2d 494]; *Strupelle* v. *Strupelle,* 59 Cal.App. 526 [211 P.248]; *Remley* v. *Remley,* 49 Cal.App. 489 [193 P. 604].) The inference is out of harmony with suggestions that property determinations should generally be made at the same time as other divorce issues are decided. (*Pereira* v. *Pereira,* 156 Cal. 1, 10 [103 P. 488, 134 Am.St.Rep. 107, 23 L.R.A. N.S. 880]; *Klebora* v. *Klebora,* 118 Cal.App. 613, 619 [5 P.2d 965]; *Huneke* v. *Huneke,* 12 Cal.App. 199, 203 [107 P. 131].) It is also out of harmony with common practices of trial judges and divorce counsel throughout the state.

These dissonant authorities deal with appeals from interlocutory judgments and need not trouble us here. Paramount here is the fact that neither Doctor nor Mrs. Fritschi appealed from the interlocutory decree. It is now conclusive, both because of lapse of time (*Leupe* v. *Leupe, supra,* 21 Cal.2d at 148) and because one of the parties died during the interlocutory period (*Darter* v. *Magnussen, supra,* 172 Cal.

---

*The facts in suit antedate enactment of Civil Code section 169.2, operative September 18, 1959, which now stamps the husband's post-interlocutory earnings and accumulations with a separate character.

App.2d at 718). The problem here is one of interpreting the decree.

At least on its surface, *Johnston* v. *Johnston* posits a fixed rule of interpretation—an interlocutory decree which expressly reserves power to grant general relief at the time of the final decree will not be construed as an immediate disposition of community property. *Johnston* derived the proposition from the following pronouncement in *Webster* v. *Webster*, 216 Cal. 485, 493 [14 P.2d 522] : ''Assuming the rule to be that the court below was without power to *dispose* of the community property in the interlocutory decree, a point we need not now decide, we are of the opinion that the decree here involved, when construed as a whole, may reasonably be said to constitute but a determination of how and the manner in which the property should be assigned upon the entry of the final decree. This construction is borne out by that portion of the decree which, after decreeing that plaintiff shall be entitled to a divorce upon the expiration of one year from the date thereof, declares that 'at that time the court shall grant such other and further relief as may be necessary to complete disposition of this action.' However, granting that the interlocutory decree contains some language susceptible of the interpretation contended for by the plaintiff, and granting further that such disposition of the property in the interlocutory decree would be improper, it is our opinion that the language thus purporting to make final disposition of the property may properly be disregarded as surplusage. . . . This being so, plaintiff's rights will be fully protected by an order directing the court below upon entering the final decree to assign the property according to the determination expressed in the interlocutory decree.''

The quotation speaks for itself. *Webster* v. *Webster* simply described certain assumed errors (involving ''a point we need not now decide'') which could be corrected by an appellate court without reversing or modifying the interlocutory judgment of divorce. The court was careful not to translate these assumptions into fixed doctrine. *Webster* v. *Webster* did not pronounce an inflexible canon of interpretation, to be followed through thick and thin, oblivious of other language in the decree and blind to the manifest intentions of the divorce court and parties. Nor, viewed with accuracy, is *Johnston* v. *Johnston* to be regarded as authority for a fixed interpretive doctrine.

 Interpretation of interlocutory decrees pursues ex-

actly the same purpose and entails the same methods as interpretation of other legal documents. The objective is to accomplish, not frustrate, the intent of the parties to the document, here the trial judge in the divorce action, the wife, the husband, and their respective attorneys. If they have an intent and the words of the document clearly describe it, there is no problem. If the words are cloudy, susceptible of clashing construction, we must resort to evidence of intent. The evidence may be internal, lying within the pages of the document; it may be external, consisting of the parties' actions and statements. We need not cite authority for these elemental doctrines.

 The interpretive problem here is whether the interlocutory divorce decree in *Fritschi* v. *Fritschi* was intended as a deferred or immediate division of the community property. Plaintiff's case rests in large part on a claim of deferment, defendant's on claimed immediacy. Plaintiff points to the clause expressive of general relief which may be granted at the time of the final decree. In all realism the clause throws little weight on the scale of intent. It is a stock phrase, designed to describe the divorce court's continuing power over any potential family problems not previously solved. It is nothing more than a ritualistic repetition of identical language in Civil Code section 132. Thus it is not even operative to preserve a jurisdiction which might otherwise die. Viewed as an attempted description of intent to defer property division, it possesses an inaptness hard to match. It simply expresses no purpose to nullify or postpone an otherwise immediate distribution of community property.

The property provisions of the Fritschi interlocutory decree were cast in the present tense, declaring that each party was "hereby" awarded designated items. No motion for new trial was filed and no appeal taken. Upon the decree's entry husband and wife each received and kept the items so divided. They exchanged quitclaim deeds to the real estate. Mrs. Fritschi made all monthly payments on the residence awarded to her. She executed a release of any community interest in the Sun Life Assurance policy. Dr. Fritschi surrendered various other insurance policies for their cash value. He sold some of the real estate set aside to him. A few months after the interlocutory decree Mrs. Fritschi filed a separate income tax estimate. Later, on the advice of their attorneys, they agreed to file separate income tax returns for 1958. In short, both parties accepted and acted

upon the assumption that the decree fully and finally distributed the listed items of community property. The immediately operative language of the decree coupled with the parties' practical application of it demonstrate that court, counsel, husband, and wife intended it to invest the described property items with a separate character forthwith.

We have quoted the decree provisions awarding the "medical practice" to Dr. Fritschi. Counsel for Mrs. Teed argues that this provision embraced Dr. Fritchi's earnings during the postinterlocutory period; thus, that any gifts or transfers derived from these earnings were made from separate funds. Counsel for Mrs. Fritschi responds that the decree did not award future earnings; that these earnings were community property as a matter of law and the court had no power to alter their character.

So far as the question is one of jurisdiction or power, we hold that the court did indeed have power to award the doctor his postinterlocutory earnings as separate property. The Supreme Court's 1915 decision in *Brown* v. *Brown*, 170 Cal. 1 [147 P. 1168], is usually cited for the doctrine that (before the 1959 adoption of Civil Code section 169.2) a husband's postinterlocutory earnings were community property. The doctrine was a qualified one, applicable only in the absence of adjudication by the interlocutory decree. (*Brown* v. *Brown*, *supra*, 170 Cal. at pp. 4, 7.) If indeed the Fritschi decree did adjudicate the character of the husband's future earnings during the interlocutory period, there was no lack of authority on the court's part. (*French* v. *French*, 17 Cal.2d 775 [112 P.2d 235, 134 A.L.R. 366].)

On divorce and dissolution of the community a professional practice perforce remains in the hands of the spouse licensed to practice it. Nevertheless, in terms of its existing economic potential, it may have a substantial worth which must be taken into account in evaluating the community estate for divorce purposes. (*Brawman* v. *Brawman*, 199 Cal.App.2d 876, 882 [19 Cal.Rptr. 106] ; *Mueller* v. *Mueller*, 144 Cal.App.2d 245, 251 [301 P.2d 90].) Dr. Fritschi established and built up his medical practice throughout the years of his marriage to plaintiff. The evidence demonstrates that this practice had netted more than $40,000 per year for several years preceding the divorce. During the period between the interlocutory decree and his death, Dr. Fritschi's net professional income was almost $47,000. Thus, at the time the divorce court was formulating the property division,

the expectation of future professional income was a valuable asset of the marital community. If the court distributed the "medical practice" to Dr. Fritschi with the intention of imposing a separate character on $47,000 of earnings during the interlocutory year, the result would have been an award which violated the law's mandate that, in the case of a divorce grounded on extreme cruelty, the nonoffending spouse, Mrs. Fritschi, receive more than one-half the community estate. (*Harrold* v. *Harrold,* 100 Cal.App.2d 601, 608 [224 P.2d 66].) Whether, under these circumstances, the award of the medical practice can be interpreted to include anything other than existing physical assets and accounts receivable is a question we need not now decide; nor need we consider the parties' conduct as a possible transmutation of postinterlocutory earnings. (See *Haseltine* v. *Haseltine,* 203 Cal. App.2d 48, 58-59 [21 Cal.Rptr. 238].)

Whatever might be the result of an heirship proceeding or other suit aimed directly at tracing and securing a share of Dr. Fritschi's postinterlocutory earnings, and even on the assumption that such earnings were community income, Mrs. Fritschi cannot prevail here. As we have noted, her claims rest upon an asserted commingling which imposes a community coloration on expenditures from the intermixed funds. The argument fails, since there is no lack of traceability during the postinterlocutory period. Dr. Fritschi had receipts of approximately $40,000, mostly from liquidation of assets set aside to him as his separate property. His separately owned assets being ascertainable and traceable, they did not lose their separate character upon being deposited in the same account with his professional income, even assuming that the latter was a community asset. (*Estate of Goodhew,* 174 Cal.App.2d 75 [344 P.2d 63]; *Kenney* v. *Kenney,* 128 Cal.App.2d 128, 136 [274 P.2d 951]; *Thomasset* v. *Thomasset,* 122 Cal.App.2d 116, 124 [264 P.2d 626].) Dr. Fritschi had more than enough separate money to make the payments now under attack. There was no lack of evidence to support the trial court's finding that these payments were made from separate funds.

The above discussion disposes of the claim that postinterlocutory expenditures for Mrs. Teed's benefit were made with community funds. There was evidence of predivorce gifts to Mrs. Teed of seven to eight hundred dollars total value. The trial court found that these were known to Mrs. Fritschi at the time the divorce was tried. The finding is supported

by substantial evidence. The record does not reveal whether any issue involving these gifts was raised in the divorce action. Since Mrs. Fritschi might have tendered this issue in the divorce suit, the issue is set at rest by the disposition of community assets made by the interlocutory decree. (*Hughes* v. *Bank of America,* 78 Cal.App.2d 631, 635 [178 P.2d 533].)

No evidence whatever was offered to support the allegations of mental incompetence and undue influence in the designation of Mrs. Teed as beneficiary of the two life insurance policies. An alternative ground for denying Mrs. Fritchi's claim to proceeds of the Sun Life Assurance policy stems from the fact that in January 1959 she executed a release of all community property interest in the policy. (See *Ettlinger* v. *Connecticut General Life Ins. Co.,* 175 F.2d 870; *Grimm* v. *Grimm,* 26 Cal.2d 173 [157 P.2d 841].) There was no evidence of any fraud or overreaching in connection with this release.

█ In the two interpleader actions the trial court ordered payment of attorney fees and costs of $317 to Sun Life Assurance Company and $417 to Massachusetts Mutual Life Insurance Company, payable out of the insurance proceeds. The judgment under appeal orders that these sums be included in the costs payable by plaintiff Mrs. Fritschi. Her counsel contends that "there was no statutory basis for the award of an attorney fee in a case of this nature." The statutory basis for this award is section 386.6 of the Code of Civil Procedure. The trial court properly exercised its discretion under that section.

Judgment affirmed.

Schottky, Acting P. J., and Brown (R.M.), J.,* concurred.

A petition for a rehearing was denied April 8, 1963, and the petition of appellant Rose Marie Fritschi for a hearing by the Supreme Court was denied May 8, 1963. Peck, J., did not participate therein.

---

* Assigned by Chairman of Judicial Council.