[Civ. No. 11900.   Third Dist.   May 12, 1969.]

ALYCE C. TODD, Plaintiff and Appellant, v. LEO J. TODD, Defendant and Respondent.

Bowers, Sinclair, Schiess, Mitchell & Willoughby and F. L. Sinclair for Plaintiff and Appellant.

Robinson, Robinson, Shattuck & Smith and D. R. Robinson for Defendant and Respondent.

BRAY, J.[†]—Plaintiff appeals from portions of an interlocutory decree of divorce granting her a divorce, dividing the community property, and awarding her alimony, child support and attorneys' fees.[1]

Plaintiff also appeals from a minute order dated February 1, 1967, denying attorneys' fees and costs on appeal.[2]

## Questions Presented

A. Appeal from the decree:

1. Was plaintiff entitled to an award based upon the value of the husband's education?

2. In dividing the community property, did the court improperly value the husband's law practice?

3. Value of the Christmas tree farm.

4. Alimony and child support.

---

[†]Retired Presiding Justice of the Court of Appeal sitting under assignment by the Chairman of the Judicial Council.

[1]Plaintiff does not appeal from the portion of the decree granting her a divorce.

[2]Plaintiff additionally purports to appeal from a minute order dated November 21, 1967, denying attorneys' fees, costs, child support and alimony on appeal. The record fails to disclose any notice of appeal filed from this order. Therefore, as hereinafter discussed, the matter is not before us.

B. Appeal from an order denying attorneys' fees and costs.

C. Effect of the failure to appeal from a second order denying attorneys' fees, costs on appeal and increase in support and alimony.

### Record

Plaintiff and defendant were married January 25, 1947. They separated December 26, 1964. Plaintiff had a son by a prior marriage, subsequently adopted by defendant. He is now of age and not involved in this action. The parties have two children, Laura Jean, born June 12, 1953, and Gary Lee, born June 30, 1955. Plaintiff filed a complaint for separate maintenance. Defendant filed a cross-complaint for divorce, alleging extreme cruelty which he later dismissed. Later plaintiff filed an amended complaint consisting of two causes of action, one for divorce and the other for return to the community of the law practice sold to Brian Bishop, who was joined as a party defendant. Apparently, the second cause of action was dismissed.

After a trial an interlocutory decree of divorce was granted plaintiff, awarding her a divorce and custody of the children. The other terms of the decree will be hereinafter discussed. Plaintiff's motion for new trial was denied. She then appealed from the decree.

1. Husband's Education.

■ Three months before the marriage, defendant, a high school graduate and having spent one semester at Sacramento Junior College before service in the armed forces, reenrolled at that college under the educational benefits of the Cal-Vet and G.I. programs. Without finishing his college course he was admitted to the University of San Francisco Law School, graduating therefrom with an LLB degree in June 1951, and was admitted to the State Bar. He started to practice law in Grass Valley. His assets at that time, other than his license to practice law, were practically nil. By March 1, 1965, the community had accumulated net assets in excess of $200,000, and his law practice was bringing in approximately $23,412 net per year.

Plaintiff was working prior to the marriage; she continued working the entire time defendant was in school and for several years after he started practicing law.[3] Her earnings were

---

[3]During the rest of her married life she worked on a part-time basis.

treated as community income and were used to supplement defendant's veteran's benefits to keep defendant in college and law school, and thereafter for general community purposes. The court at the time of dividing the community property valued the law practice at $9,866.47 and awarded plaintiff no portion thereof. The value was based upon accounts receivable, moneys in various banks, and goodwill valued at $1,000.

Plaintiff contended and now contends that defendant's education, partially paid for by community funds, is a community asset and that in terms of its existing economic potential it has a substantial worth which must be taken into account in evaluating the community estate for divorce purposes. The court made a finding: "EDUCATION OF DEFENDANT: . . . the value of this claimed asset is nothing $-0—."

Testimony was admitted on the value of an education, and on the value of defendant's education. A witness for the plaintiff, Philip Eden, testified that he had examined statements of defendant's earnings as an attorney since being admitted to practice and pointed out that defendant was in good health and could reasonably be expected to work until retirement age of 65; that his life expectancy was beyond that; that his average annual earnings from the law practice were $23,412, excluding business investments, stock dividends, interest, etc.; and that defendant, until he reached the age of 65, could be expected to earn $519,746. This figure did not include allowance for retirement, fringe benefits or future increases in prices and earnings. Eden then testified to factors which would cause greatly increased earnings which would make the total earnings greater than the above estimate. He then placed the value of defendant's education and law degree at $308,000.

The parties had entered into a stipulation that plaintiff could offer into evidence without the necessity of foundation certain material but subject to objection as to materiality, relevancy or competency. This material consisted of federal and state records, surveys and statistics dealing with incomes and earnings of people with various educational backgrounds and of various occupations and professions, including lawyers. Plaintiff offered these in evidence together with a bulletin "An Advantage for a Lifetime" by an officer of the United States Bureau of Census. The court sustained objections to their admission on the ground that they were "irrelevant, incompetent and immaterial because it is hearsay" and accumulative. The court did not err in refusing to admit the material.

If a spouse's education preparing him for the practice of the law can be said to be "community property," a proposition which is extremely doubtful even though the education is acquired with community moneys, it manifestly is of such a character that a monetary value for division with the other spouse cannot be placed upon it.

In *Franklin* v. *Franklin* (1945) 67 Cal.App.2d 717 [155 P.2d 637], which held that a husband's cause of action for personal injuries is not considered "property" for community division in a divorce action, the court stated (at p. 725), "the word 'property,' as used in the code sections relating to community property, does not encompass every property right acquired by either husband or wife during marriage. . . . The right to practice medicine and similar professions, for instance, is a property right but it is not one which could be classed as community property."

At best, education is an intangible property right, the value of which, because of its character, cannot have a monetary value placed upon it for division between spouses.

Plaintiff has cited no case law holding that the education of a spouse acquired in whole or in part with community moneys is tangible property, the value of which may be divided with the other spouse.

It should be pointed out that the assets of the community were the results of defendant's legal education and that in a sense plaintiff realized the value therefrom in the award to her of a value of $111,500.97 in those assets. (The court awarded defendant $89,116.35 in assets.)

2. The Law Practice.

■ While the right to practice law is a property right which cannot be classed as community property, the value of the practice at the time of dissolution of the community is community property. (*Franklin* v. *Franklin, supra,* p. 725.)

In *Brawman* v. *Brawman* (1962) 199 Cal.App.2d 876 [19 Cal.Rptr. 106], the defendant appealed from a decree denying her alimony. The plaintiff was a lawyer who had commenced his law practice one year before the marriage and whose income from it was $26,000 net at the time of the divorce action. The court said that on divorce and dissolution of the community "a professional practice goes automatically to the spouse licensed to practice it. . . . Effectually, it is the case of a silent partner withdrawing from a going business. And, if such a partner is to receive fair compensation for her share,

on her enforced retirement, it should be so evaluated.'' The court stated further that where a lucrative law business had been built by the husband during the marriage, ''the business is community property and it has a substantial value.'' (P. 882.) The court then pointed out that the appeal was not from the community property division but from denial of alimony.

''. . . Therefore, discussion of the value of the law business has application only to respondent's contention that denial of alimony is to be justified on the basis of the court's generosity in the award of property to the wife. Considering the value of the law practice for this limited purpose, it becomes clear that the wife here received not more, but less, in value of the community property than did the husband.'' (*Brawman* v. *Brawman, supra,* p. 882.)

■ ''On divorce and dissolution of the community a professional practice perforce remains in the hands of the spouse licensed to practice it. Nevertheless, in terms of its existing economic potential, it may have a substantial worth which must be taken into account in evaluating the community estate for divorce purposes.'' (*Fritschi* v. *Teed* (1963) 213 Cal. App.2d 718, 726 [29 Cal.Rptr. 114].)

In *Fritschi* v. *Teed, supra,* at pages 726-727, the court pointed out that the practice of the medical doctor husband had netted more than $40,000 per year for several years preceding the divorce, and that during the period subsequent to the interlocutory decree his net professional annual income was almost $47,000. ''Thus, at the time the divorce court was formulating the property division, the expectation of future professional income was a valuable asset of the marital community.'' The controversy was over the interpretation of the interlocutory decree as to whether it reserved the right to divide the husband's post-interlocutory earnings with the wife, and held that it did not.

■ While, of course, the division of community property is a matter in the discretion of the trial court, where, as here, the court has failed to give consideration to certain of the community property and has failed to evaluate it for division purposes, the cause must be returned to the trial court for consideration thereof.

The court did not segregate the accounts receivable from the other community accounts receivable. In fact, it failed to go into the question of what were the accounts receivable of the law practice.

In evaluating the law practice, the court accepted the Carlisle Report of $8,866.47 depreciated book value, which included the "Bank Control" of $1,704.05 and added $1,000 thereto for goodwill. The goodwill of a law practice—even one in which the husband will remain and in which there is to be a continuity of practice—is no doubt difficult to evaluate. It depends upon a variety of factors. On the record of this case we cannot say that the trial court erred in its valuation of goodwill. We see no good reason to disturb the court's finding as to the value of the goodwill, but the value of the practice as a business is another matter.

It was stipulated that the valuation date of all the property was March 1, 1965.

The parties separated December 26, 1964. Within the week defendant sold half of the law business to Bishop for $3,126.93. At that time some $11,494.27 had been advanced to clients. The court did not find accounts receivable in the law firm separately from the accounts receivable from transactions outside the law practice. The finding of total accounts receivable was $6,906.53. Of this, only $1,444.33 belonged to the law firm. No consideration was given to the $11,494.27 owing from clients for moneys advanced, except the $1,444.33. Moreover, in valuing the law business only matters which had been concluded and charged on the books were considered. Here was a law practice that in 1963 and 1964 produced $16,208 and $21,188 respectively, and in March 1965 defendant's half was valued at less than one-half of the 1963 income, without considering most of the advances for clients, the value of the partly completed accounts in the office and the law books. Defendant testified that there were many cases pending in the office at the time of the formation of the partnership. Plaintiff's accountant placed a value on the practice of $49,420.

Incidentally. there appears to be no evidence of what became of the $3,126.93 paid by Bishop to defendant for his interest in the partnership formed January 1, 1965.

Mr. Dodini was appointed by the court to examine the books of Todd and Bishop for the year 1965. Although Todd testified that many of the old cases were terminated that year, Dodini was unable to find in them what fees and costs were paid to Todd. Todd testified that in 1966 "we were still able to liquidate some of the old accounts receivable from the law practice as an individual."

Plaintiff, who kept the books for the law practice from the beginning until the separation of the parties, testified that a

partial examination of the clients cards disclosed accounts receivable as of December 1964 in the sum of $22,148.14. Plaintiff gave a list of these to Dodini, who testified that he could not find most of them in his investigation of the 1965 records.

Considering the small amount for which defendant sold one-half of his law practice and the condition of its books when investigations were made, an inference arises that defendant did considerable covering up of the financial condition of the practice. The cause will have to be remanded to the trial court for a reappraisement of the value of defendant's law practice on March 1, 1965, which should include all accounts receivable and all business then in the office.

3. The Christmas Tree Farm.

Plaintiff complains of the valuation placed upon this property. This is a 100-acre piece of land in Nevada County in which the parties owned an undivided one-half interest, the other one-half belonging to defendant's aunt and uncle. It was acquired in 1957 or 1958 for $10 per acre. On it were two A-frame cabins built by defendant, his uncle and the latter's son. An appraiser appointed by the court placed on it a total value of $7,000, or $3,500 for the parties' half interest. Whereas a plaintiff's witness appraised the whole property at $24,000, or $12,000 for the parties' half interest. The court valued the parties' half interest at $6,750 and awarded it to defendant. During the trial plaintiff offered to purchase defendant's one-quarter interest for $3,500.

It cannot be held that the court abused its discretion in determining the value of this property. It heard the qualifications of the two appraisers, their reasons for their valuations, the fact that the parties had stipulated that the report of Carlisle, a third appraiser, might be received in evidence subject to an objection by either party to the valuations in the report (other properties were included), "except that the value of the Christmas Tree Farm is in issue, and the value will be set at $5,000.00 unless the plaintiff files an objection. . . ." It appeared too that the property was subject to an oral agreement between the two families; that the property was to be held for their children. Defendant's uncle had three sons, two of whom had picked out cabin sites on the property. This evidently actuated the court in awarding the proprty to defendant. Plaintiff's offer for the property was self-serving. The court placed a valuation of $6,750 on the one-half interest.

Had the court placed a valuation of $7,000 on the half interest (the lowest amount suggested by the appraisers), it would merely have meant that the value of the community assets awarded defendant was $250 more than shown. We cannot say that the court abused its discretion.

4. *Alimony and Child Support.*

In the interlocutory decree plaintiff was awarded the custody of the two minor children, with visitation rights in defendant; defendant was ordered to pay $150 per month for the support of each child and alimony in the sum of $200 per month. Plaintiff contends the trial court abused its discretion in this respect. The granting of child support and alimony is a matter largely in the discretion of the trial court. (*Nunes* v. *Nunes* (1964) 62 Cal.2d 33, 38 [41 Cal.Rptr. 5, 396 P.2d 37].) In *Stuckey* v. *Stuckey* (1964) 231 Cal.App.2d 382, 385 [41 Cal.Rptr. 792], the court points out that in determining the amount of alimony to be awarded the court weighs the wife's need against the husband's ability to pay and practically everything which has a legitimate bearing upon the present and prospective matters relating to the lives of both parties, and that consideraction should be given to property owned and obligations to be met, as well as to ability to earn and actual earnings.

The interlocutory decree was filed February 1, 1967. As before stated, it awarded the wife assets of the value of $111,500.97. She was required to pay debts amounting to $1,800. The husband was required to pay debts amounting to $20,137.33. While in 1965 there was evidence that defendant had available nearly $2,000 a month, this sum was from both the law practice and community assets, and those assets were now being divided up.

In a contempt hearing in March 1966, before entry of the interlocutory decree, defendant testified that the total amount he received in 1965 was $12,800 and that obligations to preserve the community assets amounted to approximately $1,000 per month. After several additional hearings on plaintiff's various motions in which the question of defendant's ability to pay was considered, the court filed its findings on November 25, 1966, in which it found that the total of $500 a month child support and alimony was adequate.

Plaintiff set forth requirements of need based upon the financial position of the parties prior to their separation, and her physician testified that because of illness she was unable to

accept employment. At the date of the interlocutory decree, defendant's income from the law practice and from his position as county counsel does not appear to justify maintaining the family in the condition it was in before the split. This is one of the results from a divorce that it is difficult for a wife to understand. Apparently, as far as we can make out from the confused records, defendant's income from Todd and Bishop for the year 1966 and his position as county counsel would not justify a greater allowance than the court made. We do not find that the court abused its discretion in the award in the interlocutory decree of child support and alimony.

B. Appeal from Order Denying Attorneys' Fees and Costs.

On February 1, 1967, the same day that the interlocutory decree of divorce was filed, the court by minute order denied a motion for attorneys' fees and costs. Plaintiff appeals therefrom, contending abuse of discretion by the trial court.

On January 30, 1967, plaintiff's attorneys served and filed a notice of motion to the effect that on February 1 they would move the court for an order directing defendant to pay them $4,965 on account of attorneys' fees and $2,360.02 on account of advanced costs "as directed in the Memorandmu of Decision" filed on August 4, 1966 (these were the same amounts found due by the court in its findings on November 25, 1966, and in the interlocutory decree of February 1, 1967, and for the further sum of $2,225 for attorneys' fees and $815.65 for advanced costs, "all of which have been incurred since the 26th day of January, 1966."

". . . Discretion to grant or refuse a request for counsel fees and costs is vested in the trial court. [Citations.] Abuse of discretion is never presumed but must be affirmatively established in order to justify interference by an appellate court." (*Price* v. *Price* (1963) 217 Cal.App.2d 1, 10 [31 Cal.Rptr. 350].) In that case it was held that in view of the wife's resources it was not an abuse of discretion to deny her attorney's fees and costs. There was evidence upon which the court in the instant case could have found that defendant's income and expenses did not justify his being required to pay attorneys' fees and costs greater than those awarded in the interlocutory decree. Again, we do not find that the court abused its discretion.

C. Failure to Appeal.

On April 5, 1967, plaintiff filed a notice of motion for attorneys' fees and costs and increased alimony and support. This motion was denied on November 21, 1967.

Although this order is an appealable order (*Millington* v. *Millington* (1968) 259 Cal.App.2d 896, 926 [67 Cal.Rptr. 128]), no appeal was filed therefrom. Curiously enough, both parties have devoted considerable portions of their briefs to discussions of the validity or nonvalidity of this order. In the absence of a notice of appeal from the order, this court has no jurisdiction to go into the matter ██ ''Nor can jurisdiction be conferred on the appellate court by the consent or stipulation of the parties, estoppel, or waiver.'' (*Estate of Hanley* (1943) 23 Cal.2d 120, 123 [142 P.2d 423, 149 A.L.R. 1250].)

So much of the interlocutory decree as relates to the value of the law practice is reversed with directions to the trial court to re-evaluate the same in accordance with this opinion and to divide the same between the parties in the same proportions as the balance of the community property was divided.

In all other respects, the judgment is affirmed. The order denying attorneys' fees and costs dated February 1, 1967, is affirmed.

Pierce, P. J., and Regan, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied July 9, 1969. McComb, J., was of the opinion that the petition should be granted.