YVONNE WESTBROOK (NOW YVONNE WESTBROOK MACIEL), PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 618–79.    Filed September 23, 1980.

*Philip M. Schafer,* for the petitioner.
*Barbara Leonard,* for the respondent.

FAY, *Judge:* The respondent determined a deficiency of $3,579 in petitioner's Federal income tax for 1975. The only issue presented is whether a payment received by petitioner under a 1974 separation agreement constitutes taxable alimony under section 71.[1]

### FINDINGS OF FACT

Some of the facts were stipulated and are found accordingly.

At the time she filed her petition in this case, petitioner Yvonne Westbrook, now Yvonne Westbrook Maciel (hereinafter petitioner), was a resident of Crescent City, Calif.

Petitioner married Robert Westbrook (hereinafter Robert) in 1955 at the age of 18. Throughout their marriage, the couple lived in Smith River, Calif., in the northernmost part of the State. They had four children, born between 1956 and 1961. Petitioner and Robert separated and were divorced in 1974.

The couple's financial status was initially based upon Robert's inheritance from his father. During the year prior to his marriage to petitioner, Robert inherited one-half of his father's 40-percent interest in a partnership called Reservation Ranch, plus stocks, bonds, and other property. The total after-tax value of Robert's inheritance was $79,251. Robert's brother, Henry, inherited the other half of their father's interest in Reservation Ranch; each brother's 20-percent share was then worth $50,570.

Petitioner was never informed about the financial details of her husband's business and was always excluded from such knowledge. Although Robert testified in this case, he was unable to provide exact figures about the size or growth of his wealth or business interests during his marriage to petitioner. Consequently, the full value of his holdings in Reservation Ranch at the time of the divorce can only be estimated.

When petitioner and Robert were married in 1955, Reservation Ranch had a net value of approximately $250,000. The company's office took up one room of Robert and Henry's

---

[1]Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954 as amended.

mother's house and was staffed by their mother and one other lady. By 1974, Reservation Ranch employed between 150 to 200 people, had a main office with a staff of at least 6, including a full-time CPA and other accountants, and had several other offices for the business's various divisions and affiliates, each with its own full-time staff. In February 1980, when this case was tried, Robert estimated the current annual gross income of Reservation Ranch and its affiliates to be approximately $80 million. However, Robert guessed that the business's 1974 gross income was only 10 percent or less of the 1979–80 figure. Robert attributed this 10-fold or larger growth in income over the 5-year period following the divorce to his brother's skill in managing timber operations. At trial, Robert was unable to remember the amount of his 1974 net worth or income, or Reservation Ranch's income or worth for 1974.

Robert and Henry managed Reservation Ranch as equal partners. The record does not disclose whether the 60-percent interest in the ranch not held by their father at his death was already owned by the brothers, was later acquired by them, or continued to be held by third parties. Each of the brothers was responsible for one or more divisions or affiliates of Reservation Ranch, which may or may not have been separate legal entities. Henry managed the ranch itself and, later, the logging part of the business. Robert managed a number of other projects. All of the various affiliates of the business will be treated herein as component parts of "Reservation Ranch."

The first affiliate Robert managed was called Countrymaid Dairy. Organized as a marketing division of Reservation Ranch, Countrymaid Dairy distributed the ranch's dairy products. Robert oversaw all of the dairy's day-to-day operations and controlled its finances. Although Countrymaid Dairy more than doubled in size and continued to be run as a full-scale operating division of the business throughout Robert's marriage to petitioner, Robert testified that the dairy had never turned a profit and did not increase in value during the marriage.

In the mid-sixties, Robert turned his attentions to a small fishing resort located at the mouth of the Smith River called Ship Ashore. A manager was hired for Countrymaid Dairy. Ship Ashore was named for a large ship that had been pulled up on shore and that contained a gift shop. The business was purchased by Reservation Ranch for approximately $200,000, and an

additional \$500,000 to \$1 million was invested in expanding the project. A 30-room motel was added, the restaurant was completely remodeled, and the boat dock and trailer park were improved. Ship Ashore had trailer park facilities for 50 to 60 permanent mobile homes and 50 to 60 travel spaces. Robert testified that Ship Ashore was also not profitable, although it continued to be operated as a going concern.

Other enterprises of Reservation Ranch that had not turned out to be profitable were discontinued. These included a homebuilding business, which marketed prefabricated houses, and a bulb farming business, which at one time was a leading national distributor.

At some point during petitioner's marriage, Robert's brother Henry turned his attention to the timber business. Reservation Ranch's logging operations were carried on throughout Oregon as well as in northern California. Although petitioner could not put a dollar value on the logging business, she knew it was doing very well, with foreign and domestic sales, a 20- to 30-truck fleet of new equipment, a company helicopter, and the logging business's separate offices.

During the marriage, Reservation Ranch was able to acquire numerous other properties in northern California. The Lehman Ranch was purchased for approximately \$200,000, the Mello Ranch for approximately \$180,000, and the McNamara Ranch for a total of \$300,000 under a lease-purchase agreement.

Nearly all of the wealth Robert acquired was kept inside the Reservation Ranch partnership. According to the separation agreement petitioner and Robert executed in 1974, the only assets the couple owned besides their clothes and furniture were 100 shares of Gulf Oil stock worth about \$2,250, a savings account containing \$450, and certificates of deposit worth approximately \$9,000. They did not own the house they lived in or the car petitioner used as her own; presumably these were the property of Reservation Ranch. They lived modestly. For household expenses, Robert gave petitioner his "paycheck," which at first was \$600 a month and in the last 2 years of the marriage was increased to \$1,200 a month. What Robert described in testimony as his "paycheck" was in fact an even dollar amount of partnership draw and did not represent a salary or other form of compensation paid by Reservation Ranch.

When the couple decided to separate, Robert Dedekam (hereinafter Dedekam) acted as attorney for both petitioner and Robert. Petitioner chose Dedekam because she trusted him more than the other attorneys she knew, all of whom worked for Reservation Ranch on a regular basis. However, Dedekam had also done some work for Robert and had been a friend of Robert's since the two attended private school together during childhood. Robert and Dedekam occasionally went duck hunting together, and they kept in touch socially. Dedekam explained to petitioner that either she or Robert would need separate counsel if disagreements arose between them about reaching a settlement. However, Dedekam continued to represent them both during negotiations even after petitioner rejected Robert's first offer out of hand. At the time of the trial in this case, petitioner was suing Dedekam in the California courts alleging that he failed to represent petitioner adequately during the settlement and divorce because of an improper conflict of interest.

In the settlement agreement executed March 1, 1974, which Dedekam negotiated for both parties, it was agreed that petitioner would receive $600 per month as alimony and $600 per month as child support. With respect to community property, petitioner received approximately $11,700 in stocks and bank obligations, her clothes and all the home furnishings, and the car she drove ("which vehicle is presently not owned by the couple"). Robert received his clothing and personal effects plus "Any possible community interest that Husband might have in a certain partnership known as Reservation Ranch, Countrymaid Dairy, Ship Ashore, and all of their affiliated and related organizations, whether corporate, partnerships, or otherwise." The effect of the agreement was that petitioner turned over to Robert her entire "possible" community property rights in Robert's share of Reservation Ranch in return for a car, her home furnishings, and $11,700.

The parties also agreed that petitioner would receive $100,000 in installments. Robert originally offered her $35,000, whereupon petitioner completely lost her self-control and demanded at least $100,000. She felt that the wealth of the family was obvious, that $35,000 was grossly unfair. Robert acquiesced without making a counteroffer. The agreement provided:

With respect to support for the Wife, Husband agrees that he will provide the following:

(1) Monthly payments at the rate of $600 per month until such time as Wife shall either die or remarry. Said payments shall commence March 1, 1974.

(2) In installments, Husband additionally agrees to pay Wife the total sum of $100,000. Said sum shall be paid in annual installments commencing March 1, 1974 at the rate of $9,900 per year for 10 years, and the sum of $1,000 in the eleventh year.

Although described as additional "support," the $100,000 principal sum was not contingent upon petitioner's death or remarriage. The agreement further provided that interest of 6½ percent per annum was due on the outstanding balance. In addition, the couple agreed that Robert would guarantee a bank loan for petitioner of up to $50,000, and that payments on the loan by Robert would offset or reduce his obligations on the principal sum.

Petitioner's understanding of her rights under California community property law and the tax consequences of the separation agreement was based solely on Dedekam's representations. In February 1974, Dedekam sent petitioner a letter explaining the separation agreement which stated in part:

Dear Yvonne:

I have gone over the tax consequences of the draft of the agreement that I heretofore sent you, as amended per our last office visit. Frankly, I find some tax problems for both of you. The annual payments are going to constitute taxable income to you. In addition, to make them deductible, we have to use a term of over ten years with *no more than ten percent being paid in any one year*.[2]

Dedekam also advised petitioner that, under California law, Robert's interest in Reservation Ranch was his separate property and not community property. Although Robert testified that his accountant had provided Dedekam with some tax data, petitioner was unable to provide Dedekam with any financial information, and, insofar as petitioner was aware, Dedekam made no independent investigation to determine the extent of her community property rights in her husband's business.

An interlocutory judgment of dissolution of marriage was entered May 24, 1974, incorporating the settlement agreement between Robert and petitioner. The divorce was made final December 20, 1974.

---

[2]The letter does not explain to petitioner that she has any choice in determining the tax consequences to her. Instead, its purpose is to explain why her yearly payments had to be kept relatively small.

After discussing her situation with an accountant, petitioner decided not to include the $9,900 installment payments she received in 1974 and 1975 on her income tax returns for those years.

In his statutory notice for 1975, respondent increased petitioner's income by $9,900 on the ground that such was a periodic payment of alimony under section 71.

## OPINION

The sole question presented is whether petitioner must include in her income an installment payment she received pursuant to a separation agreement incorporated in a decree of divorce.

The taxation of payments received pursuant to a divorce decree is determined under section 71. Section 71(a)(1) provides that the wife must include in her income "periodic payments" imposed on the husband[3] because of the marital or family relationship under a decree of divorce or separate maintenance. The term "periodic payments" does not include a fixed principal sum paid in installments unless, under the terms of the decree or other written instrument, the payment period ends more than 10 years after the date of the instrument.[4] *Furrow v. Commissioner*, 34 T.C. 931 (1960), affd. 292 F.2d 604 (10th Cir. 1961).

Both of the parties herein have proceeded upon the assumption that the 11 annual installment payments called for in the separation agreement extend over a period of more than 10 years. Contra, *Spicknall's Estate v. Commissioner*, 285 F.2d 561 (8th Cir. 1961), revg. a Memorandum Opinion of this Court;

---

[3]Sec. 71 also applies to alimony, if any, paid by the wife. Sec. 7701(a)(17).

[4]SEC. 71. ALIMONY AND SEPARATE MAINTENANCE PAYMENTS.

(c) PRINCIPAL SUM PAID IN INSTALLMENTS.—

(1) GENERAL RULE.—For purposes of subsection (a), installment payments discharging a part of an obligation the principal sum of which is, either in terms of money or property, specified in the decree, instrument, or agreement shall not be treated as periodic payments.

(2) WHERE PERIOD FOR PAYMENT IS MORE THAN 10 YEARS.—If, by the terms of the decree, instrument, or agreement, the principal sum referred to in paragraph (1) is to be paid or may be paid over a period ending more than 10 years from the date of such decree, instrument, or agreement, then (notwithstanding paragraph (1)) the installment payments shall be treated as periodic payments for purposes of subsection (a), but (in the case of any one taxable year of the wife) only to the extent of 10 percent of the principal sum. For purposes of the preceding sentence, the part of any principal sum which is allocable to a period after the taxable year of the wife in which it is received shall be treated as an installment payment for the taxable year in which it is received.

*Newman v. Commissioner*, 26 T.C. 717, 721 (1956), affd. 248 F.2d 473 (8th Cir. 1957).[5] Instead, the issue that has been addressed by the parties is whether the $100,000 principal sum agreed to by Robert and petitioner was in the nature of support or represented a property settlement.

It is well established that payments in consideration of the relinquishment of property rights are outside the scope of section 71. Sec. 1.71–1(b)(4), Income Tax Regs.; *Hesse v. Commissioner*, 60 T.C. 685 (1973), affd. without published opinion 511 F.2d 1393 (3d Cir. 1975), cert. denied 423 U.S. 834 (1975). Such payments are instead treated as a division of capital, even though they are periodic and incident to a divorce. *Bishop v. Commissioner*, 55 T.C. 720 (1971). Whether a particular set of payments represents support or a property settlement is a question which turns on the facts and not upon the label given to the payments by the parties or by the court granting the divorce. *Riddell v. Guggenheim*, 281 F.2d 836 (9th Cir. 1960); *Mirsky v. Commissioner*, 56 T.C. 664 (1971).

In analyzing this issue, the courts have focused upon both the form of the payments, from which the intent of the parties can be inferred (*Ryker v. Commissioner*, 33 T.C. 924 (1960)), and upon the nature of the property interest, if any, surrendered (*Weiner v. Commissioner*, 61 T.C. 155 (1973)). See generally *Warnack v. Commissioner*, 71 T.C. 541 (1979). The parties herein have so argued the case before us.

Respondent first argues that the installment payments in controversy should be treated as taxable alimony because they are described as support in the settlement agreement and were intended by petitioner and Robert to be taxable. Second, respondent argues that petitioner has failed to prove she relinquished any substantial community property rights in exchange for the $100,000 principal sum. Petitioner argues that the evidence as a whole shows that the $100,000 was intended as payment in exchange for her community property share of Robert's interest in Reservation Ranch. We agree with petitioner.

To begin with, the intent revealed in the settlement agreement itself is ambiguous. Although described as "support," the

---

[5]See also *Derickson v. Commissioner*, T.C. Memo. 1976–297.

installment payments were for a fixed principal sum, were due over a fixed term, and were not contingent upon petitioner's death or remarriage.[6] The unpaid balance of the principal sum bore interest. In short, except for the label affixed to the payments, they bore none of the earmarks of spousal support. Furthermore, we note that Robert agreed to pay petitioner terminable alimony plus child support totaling $1,200 a month, the precise amount of "support" she had been receiving prior to the divorce. The implication is that the $100,000 principal sum was for something else.

We do not think petitioner should be prejudiced by the representations made to her by her attorney during the divorce. The sum and substance of petitioner's negotiating position was that her share of the marital property was worth at least $100,000 more than the other property she had been offered, and that was exactly what she received.

We recognize that in *Warnack v. Commissioner, supra,* we recently gave substantial weight to the language chosen by the parties to a settlement agreement where there was an approximately equal division of community property and where each party was independently represented by counsel. However, such an approach should not be applied in this case, where one attorney handled the divorce for both parties and where the preponderance of the evidence indicates that the division of community property was overwhelmingly in Robert's favor. See *Weiner v. Commissioner, supra; Gerlach v. Commissioner,* 55 T.C. 156 (1970).

Respondent's contention that petitioner failed to prove she surrendered any community property rights in Reservation Ranch is based upon Robert's testimony and upon what we view as a misconstruction of California law. Briefly summarized, Robert testified that none of the Reservation Ranch affiliates he managed had ever turned a profit and that all of his wealth was due to his brother Henry's successful management of the partnership's ranching and timber operations. However, based upon all of the evidence produced at trial and our observation of

---

[6]Respondent argues that under Cal. Civ. Code sec. 4801(b) (West 1970), support payments are presumed to terminate on death or remarriage. This argument is disingenuous because it assumes the very thing it seeks to prove—that the payments were for support. Moreover, it ignores the facts that the monthly payments were expressly made terminable and the installment payments were continued by Robert after petitioner's second marriage.

Robert's character and demeanor on the stand, we have not accepted Robert's testimony in its entirety. Robert's testimony was at best evasive and self-serving and was in many respects incredible. We found it especially difficult to accept the implication in Robert's testimony that Reservation Ranch's gross income grew only gradually during his 21-year marriage to petitioner but increased 10- to 20-fold in the 5 years that followed. Nor is it believable that Henry kept Robert on as a full partner for 25 years, making him a very wealthy man in the process, if Robert was in fact continually leading Reservation Ranch into losing ventures.

Moreover, even if we were to accept all of Robert's testimony at face value, respondent's position would still be untenable. Respondent starts with the premise that, under California law, property owned by the husband before marriage and acquired thereafter by gift or inheritance, together with the rents and profits therefrom, is his separate property. Cal. Civ. Code sec. 5108 (West 1970). It is thus clear that Robert's original $50,570 share of Reservation Ranch was and remained his separate property. All other property acquired by either spouse during the marriage is community property. Cal. Civ. Code sec. 5110 (West 1970 & Supp. 1980). Normally, some allocation is required where a husband's skill and industry in managing his separate property produces income part of which, the fruits of his labors, is community property and another part, the fruits of his capital, is his separate property. See *Pereira v. Pereira,* 156 Cal. 1, 103 P. 488 (1909); *Van Camp v. Van Camp,* 53 Cal. App. 17, 199 P. 885 (1921); *Beam v. Bank of America,* 6 Cal. 3d 12, 98 Cal. Rptr. 137, 490 P.2d 257 (1971). Examples of such an allocation where a husband manages his separate farming and dairy property include *In re Neilson's Estate,* 57 Cal. 2d 733, 22 Cal. Rptr. 1, 371 P.2d 745 (1962), and *Machado v. Machado,* 58 Cal. 2d 501, 25 Cal. Rptr. 87, 375 P.2d 55 (1962). No hard and fast rules control how such an allocation is to be made; the proper approach depends on all the facts and circumstances of a particular case. *Beam v. Bank of America, supra.* A spouse's separate property remains separate property, even though it increases in value, where it is managed by third parties. *Logan v. Forster,* 114 Cal. App. 2d 587, 250 P.2d 730 (1952). Thus, respondent contends in this case that because all of Robert's wealth was due solely to Henry's

managerial talents, Robert's share of Reservation Ranch remained entirely his separate property.

We disagree. Respondent inexplicably ignores the fact that Reservation Ranch is a partnership. Although Robert's share of the partnership earnings derived from capital was his separate property, his share of the earnings derived from his and Henry's labors was community property. This issue was settled long ago in California in *In re Gold's Estate*, 170 Cal. 621, 151 P. 12 (1915). In *Gold's Estate*, Gold owned a tavern which he operated in partnership with Sullivan, a gambler. Gold operated the saloon, which produced only modest gains, and the bulk of the partnership profits were out of Sullivan's gambling winnings. The court held that Gold's share of Sullivan's winnings, which Sullivan paid to Gold, were the community property of Gold and Mrs. Gold. The same reasoning applies in the instant case. Robert and Henry shared the task of managing Reservation Ranch and its affiliates and shared the profits. Robert's share of the profits derived from their joint labors was, therefore, his and petitioner's community property. *Todd v. Todd*, 272 Cal. App. 2d 786, 78 Cal. Rptr. 131 (1969); *Rosenthal v. Rosenthal*, 240 Cal. App. 2d 927, 50 Cal. Rptr. 385 (1966); *Haldeman v. Haldeman*, 202 Cal. App. 2d 498, 21 Cal. Rptr. 75 (1962).[7] Since every indication in the record is that, for the most part, Reservation Ranch's earnings were kept inside the business, it cannot be contended that the community was fully compensated by the business for Robert's efforts. See *Beam v. Bank of America, supra.*

Petitioner bears the burden of proving that she relinquished an interest in property in exchange for the $100,000 in installment payments she received. *Hesse v. Commissioner*, 60 T.C. 685 (1973), affd. without published opinion 511 F.2d 1393 (3d Cir. 1975), cert. denied 432 U.S. 834 (1975). However, to do so, she need not establish the precise extent of the community property interest she surrendered. Nor must we determine what alloca-

---

[7] The statement in *Wood v. Gunther*, 89 Cal. App. 2d 718, 201 P.2d 874, 880 (1949), that, "While the interest of a partner in a partnership is not, as such, community property, yet as between the surviving spouse, the heirs at law, the administratrix and the individual creditors of the deceased partner's estate, it is governed by community property rules," is not to the contrary. The court was merely trying to make clear that a wife's community property rights in her husband's partnership interest did not give her any immediate rights in the control of partnership affairs or property. See *Rosenthal v. Rosenthal*, 240 Cal. App. 2d 927, 50 Cal. Rptr. 385, 388 (1966).

tion would be made by a California court between Robert's separate property and community property. Suffice it to say that the evidence taken as a whole shows that petitioner's community property rights in Robert's share of Reservation Ranch were worth more than the $100,000 and other property petitioner received under the settlement agreement.

We hold that the $9,900 payment petitioner received on the $100,000 principal sum in 1975 is not taxable to her under section 71.

Accordingly,

*Decision will be entered for the petitioner.*