DOROTHY OLSTER, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 12727–80.    Filed September 13, 1982.

*Marsha Palmer Niles*, for the petitioner.
*David M. Kirsch*, for the respondent.

STERRETT, *Judge*: By notice of deficiency dated April 11, 1980, respondent determined a deficiency in petitioner's Federal income tax for the taxable year 1976 in the amount of $26,796.62.[1] After concessions, we must decide (1) whether certain property petitioner received pursuant to a stipulation for modification of agreement and lump-sum settlement agreement was in full settlement of the ex-husband's past, as well as future, alimony obligations or was solely in settlement of future alimony obligations; (2) if the property was received at least in part for alimony arrearages, whether petitioner is taxable to the extent of the lesser of such arrearages or the fair market value of the property; (3) if the property was received in settlement for alimony arrearages, the amount of such arrearages; and (4) the fair market value of such property received by petitioner in satisfaction of her ex-husband's alimony obligations.

## FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts and exhibits attached thereto are incorporated herein by this reference.

Petitioner was a resident of Miami, Fla., at the time of filing the petition herein. She filed an individual Federal income tax

---

[1]Respondent also determined an addition to tax pursuant to sec. 6653(a), I.R.C. 1954, for 1976 in the amount of $1,339.83. Respondent now concedes that petitioner is not liable for such addition.

return for the taxable year 1976 with the Office of the Internal Revenue Service, Chamblee, Ga.

Petitioner and her ex-husband were divorced on April 11, 1972.[2] The final judgment dissolving the marriage of petitioner and her former husband incorporated by reference a property settlement and custody agreement dated April 6, 1972. The original property settlement and custody agreement provided for permanent alimony in the amount of $2,500 per month for the life of petitioner, or until such time as she remarried, in which event Mr. Olster would be obligated to pay her a lump-sum amount equal to 2 years' alimony ($60,000).

On June 10, 1976, petitioner and her ex-husband executed a document entitled "Stipulation for Modification of Agreements and Lump-Sum Settlement Agreement" (hereinafter the modification agreement) which modified the original settlement agreement executed by petitioner and her ex-husband on April 6, 1972. The modification agreement provided in pertinent part as follows:

Now THEREFORE, in consideration of the mutual covenants and conditions herein contained, and other good and valuable considerations, it is mutually covenanted and agreed between Evan Olster and Dorothy Olster as follows:

1. The parties agree that paragraph 9 of the agreement of 6 April 1972 be deleted, rendered null and void, and of no further force and effect.

2. In consideration of and for Wife having released the Husband from his obligation to provide future alimony to her pursuant to paragraph 9 of the agreement of 6 April 1972, the Husband agrees to pay as a lump sum settlement of his obligation to pay future alimony pursuant to paragraph 9 of the agreement of 6 April 1972 the following:

A. Husband will forthwith cause the mortgages receivable set forth on Schedule "A" hereof to be assigned to the Wife and the Husband shall personally endorse the mortgages and mortgage notes with recourse so that in the event that any of the mortgages become in default, the Husband shall be personally obligated to pay to the Wife any deficiency which results from said default.

B. The Husband shall execute and deliver to the Wife a promissory note in the sum of $25,000.00 bearing interest at the rate of 6% per annum and payable within one year from date hereof.

3. In consideration of and for the lump sum settlement of future alimony payments under paragraph 9 of the agreement of 6 April 1972 as hereinabove provided in paragraph 2, the Wife hereby agrees to remise, release, and forever discharge the Husband from any obligation to pay to her any past

---

[2]Petitioner was born on Aug. 26, 1937, and her ex-husband was born on Oct. 4, 1931.

due alimony presently due her under paragraph 9 of the agreement of 6 April 1972, as of the date of this agreement.

\* \* \* \* \* \* \*

7. In connection with the promissory note which the Husband will deliver to the Wife by reason of paragraph 2 hereinabove, the parties agree that the the [sic] payment of.that promissory note will be secured by a mortgage on the following described property:

> The North quarter of Section 13, Township
> 55 South, Range 38 located in Dade County
> Florida.

which said mortgage will be inferior only to mortgages, liens, encumbrances and conditions of record. Husband owns the fee simple title to said property as trustee and will cause a mortgage in due form to be executed and delivered to the satisfaction of the Wife's attorneys.

It is further provided, that the mortgage referred to in this paragraph shall also be security for any default with respect to the mortgages receivable being assigned in connection with paragraph 2A hereof. However, upon the default of a mortgage under paragraph 2A, the Husband shall first have the right to substitute any such defaulted mortgage receivable with another mortgage or mortgages of equal value to the then principal balance of any such defaulted mortgage or mortgages, subject to the Wife's right of reasonable rejection of any proposed mortgage or mortgages for such substitution.

By reason of the fact that the mortgage referred to in this paragraph is unliquidated [and] at the present time open-ended, and may change from time to time, it shall never be security for an indebtedness hereunder of more than $50,000.

While the mortgage referred to in this paragraph is for the benefit of the Wife, the parties agree that the nominal mortgagee thereunder shall be James F. Pollack, as Trustee, and the parties through the execution of this agreement authorize the said James F. Pollack to hold the mortgage as trustee and to satisfy the mortgage of record when the sums it secures at any time have been paid in full. It is further provided that the mortgage on the land which is legally described in this paragraph to be given by the Husband hereunder shall be non-assignable without the written consent of the Husband, unless default first occurs in any of the mortgages referred to in Schedule "A" attached hereto.

As of June 10, 1976, Evan Olster was substantially in arrears in his alimony payments.[3] His delinquency was symptomatic of the dire financial straits in which he found

---

[3]Petitioner stated at trial that her ex-husband was in arrears in the amount of $44,800. However, on Dec. 15, 1978, petitioner executed an affidavit under oath to the effect that she was owed alimony by her ex-husband "in the approximate amount of $60,000."

himself during the mid–1970s. A registered real estate agent since 1965,[4] Mr. Olster's difficulties were traceable to the real estate recession prevailing during those years. Although he never declared bankruptcy, it was a distinct possibility during his period of financial hardship.

In correspondence immediately prior to the execution of the modification agreement, the parties were concerned with a number of areas. These included the potential bankruptcy of Evan Olster, the protection of the children, cross-proposals for drafting, and the taxable effects of the agreement. The Olsters intended Mr. Olster's obligation to his wife to survive his potential bankruptcy.

Pursuant to paragraph 2A of the modification agreement, Mr. Olster transferred mortgages with a face value of $87,243.18 to petitioner. The individual mortgages transferred were as follows:

| Mortgagor | Property | Priority of lien | Interest rate | Approximate face value |
|---|---|---|---|---|
| Eason | 7753 N.W. 10th Ave., Miami, Fla. | First | 7% | $22,827.93 |
| King | 5601 Pembroke Road, Hollywood, Fla. | First | 8% | 5,921.35 |
| Smith | 1159 N.W. 77th St., Miami, Fla. | First | 9% | 11,072.37 |
| Coan | 1536 N.W. 17th St., Ft. Lauderdale, Fla. | First | 9% | 27,623.62 |
| J. Smith | 1211 S.E. 39th Terrace, Gainesville, Fla. | Second | 9% | 9,592.51 |
| Gilmore | 1820 S.E. 39th Terrace, Gainesville, Fla. | Second | 9% | 10,205.40 |
| Total | | | | 87,243.18 |

The Eason, Smith, and Coan mortgages were "wraparound mortgages"[5] subject to an underlying mortgage, payments of

---

[4]Mr. Olster also had been an attorney since 1956.

[5]A wraparound mortgage is a mortgage given by the purchaser of property that already is encumbered. The purchaser's only obligation in such instance is the obligation to pay the

which were being maintained by Evan Olster or a corporation owned by him holding title to the mortgage receivable.[6]

Mr. Olster did not personally own any of the mortgages transferred to petitioner pursuant to the modification agreement. Instead, such mortgages were owned by one or more corporations that were owned or controlled by Mr. Olster. The mortgages were transferred at a time when each transferor corporation was solvent, albeit, barely so.

Petitioner and Mr. Olster agreed that Mr. Olster would continue to be responsible for, and to pay, the first mortgages underlying the three wraparound mortgages given to petitioner. The purpose of this agreement was to assure that petitioner would not be required to pay the underlying first mortgages in such instances. In the event Mr. Olster had failed to make the payments on the underlying first mortgages, petitioner would have been entitled to the difference between those amounts and the amounts due her under the wraparound mortgages.

Mr. Olster stated at trial that in some cases, the total amount of the encumbrance(s) approximated the value of the underlying land and that in other cases, there were small equities. On the whole, he stated, each piece of property carried an equity averaging $2,000 to $3,000.

The aggregate total of first mortgages underlying the wraparound mortgages was approximately $15,000. Mr. Olster was not personally obligated on the first mortgages underlying the three wraparound mortgages. Mr. Olster has in fact made all payments on the underlying mortgages.

In addition to the mortgages, petitioner received a $25,000 promissory note, payable in 1 year by Mr. Olster, pursuant to paragraph 2B of the modification agreement. The note was secured by a mortgage on a parcel of land located in Dade County and owned by Mr. Olster. The land was zoned as agricultural and unsuitable for development. It was pledged to Walter E. Heller & Co. to secure a loan of at least $1,500,000.

---

wraparound mortgage. The underlying first mortgage remains an obligation of the seller. In the event that the seller fails to make the payments on the underlying first mortgage, the wraparound mortgagor has the right to make the first mortgage payment and set off such payment against his obligation to the seller under the wraparound mortgage.

[6]The parties intended that another mortgage, the "Bass mortgage," was to be transferred to petitioner. However, petitioner stated that she never received this mortgage, and we believe her.

There was also a first mortgage on the land to Elvida Corp. Finally, the Internal Revenue Service had liens against the property of approximately $115,000. Mr. Olster apparently has never paid the amount due on the note.

## OPINION

The first issue we must confront is whether the consideration received by petitioner in the form of mortgages and a promissory note was paid by Mr. Olster in satisfaction of his alimony arrearages as well as his future alimony, or whether this consideration was intended only to be in satisfaction of Mr. Olster's obligation to pay future alimony to his ex-wife.

Under section 71(a)(1), I.R.C. 1954, petitioner must include in income periodic payments made pursuant to a decree of divorce by her ex-spouse.[7] When alimony payments are made there is no question but that they are taxed to the wife as income upon receipt. When, however, the husband is delinquent in making alimony payments, the tax consequences of a future lump-sum payment are less clearcut, and depend largely upon the intentions of the parties. If the payment is made strictly to satisfy back alimony, it retains the character of the original payments for which it is substituted. *Holloway v. United States*, 428 F.2d 140, 143 (9th Cir. 1970); *Davis v. Commissioner*, 41 T.C. 815, 820 (1964); *Holahan v. Commissioner*, 21 T.C. 451, 463 (1954), affd. 222 F.2d 82 (2d Cir. 1955); *Estate of Narischkine v. Commissioner*, 14 T.C. 1128, 1129–1130 (1950), affd. 189 F.2d 257 (2d Cir. 1951).

On the other hand, if a payment is made solely in consideration for the wife's release of her husband from future alimony obligations, the payment is not taxable to the wife under section 71(a). This is because such lump-sum payments do not qualify as "periodic" payments within the meaning of section

---

[7]Sec. 71(a)(1) provides as follows:

SEC. 71. ALIMONY AND SEPARATE MAINTENANCE PAYMENTS.

(a) General Rule.—

(1) Decree of divorce or separate maintenance.—If a wife is divorced or legally separated from her husband under a decree of divorce or of separate maintenance, the wife's gross income includes periodic payments (whether or not made in regular intervals) received after such decree in discharge of (or attributable to property transferred, in trust or otherwise, in discharge of) a legal obligation which, because of the marital or family relationship, is imposed on or incurred by the husband under the decree or under a written instrument incident to such divorce or separation.

71(c)(2). See *Sechrest v. United States*, 490 F.2d 102, 104 (4th Cir. 1974); *Commissioner v. Senter*, 242 F.2d 400, 403 (4th Cir. 1957), affg. 25 T.C. 1204 (1956).[8]

Where there is a mixture of alimony arrearages and future alimony obligations extinguished by payment of a lump-sum amount, the law is somewhat unsettled. In *Holloway v. United States, supra*, the Ninth Circuit held that when a lump-sum payment is made to satisfy a taxpayer's obligation to pay past, present, and future alimony, and the "nub" of the payment is for alimony arrearages, the payment is treated for tax purposes as alimony to the extent of such arrearages. The court went on to find that the payment in question was made to satisfy past, present, and future obligations due under the original property settlement agreement. Because the lump-sum settlement was found to be substantially less than the amount of the alimony arrearages, the entire payments were held to be deductible as alimony by the payor husband.

It is not clear from the Ninth Circuit's opinion whether it was intended that such treatment be conditional upon a finding that the "nub" of the payments was for alimony arrearages. Where there is a mixture of obligations, we think the proper approach is to treat the payments as in satisfaction of unpaid and accrued alimony to the extent of such alimony, unless there is an amount specifically allocated to the satisfaction of future alimony obligations, and the allocation conforms to the substance of the transaction. Thus, where there is an unequivocal basis for allocating a lump-sum payment between alimony arrearages and future alimony obligations, bifurcated tax treatment may result. Where such basis is lacking, the payment cannot be dichotomized.[9]

We must now apply this standard to the facts before us. It is clear from the record that petitioner and Mr. Olster entered into an agreement which modified the original divorce decree and in which petitioner relinquished her rights to both past and future alimony. Pursuant to the agreement, the consideration to be furnished by Mr. Olster in return for such

---

[8]See also *Wickworth v. Commissioner*, T.C. Memo. 1978–14.

[9]Perhaps this standard is precisely what the Ninth Circuit intended, without specifically articulating it, in *Holloway v. United States*, 428 F.2d 140 (9th Cir. 1970).

relinquishment was to consist of the designated mortgages and the promissory note.

Petitioner argues that the consideration received from her ex-husband was meant solely to satisfy his obligation to pay future alimony. She points to the fact that paragraph 2 of the modification agreement, which provides for the transfer of property to petitioner, only mentions the release of Mr. Olster's obligation to provide future alimony. She asserts that paragraph 2 must be read independently of the other provisions of the modification agreement, and when so read, it is inescapable that the consideration was not intended to satisfy back alimony obligations. In paragraph 3 of the modification agreement, which provides for the extinguishment of alimony arrearages, no mention is made of any consideration required of petitioner's ex-husband. Respondent contends that these two paragraphs must be read together, and consequently, that the consideration paid was in satisfaction of both past *and* future alimony obligations.

We agree with respondent. At the time the agreement was entered into, Mr. Olster owed his ex-wife a substantial amount of past alimony. Petitioner would have us believe that she surrendered her rights to this amount for nothing. We find such a contention totally unrealistic. The plain fact of the matter is that petitioner surrendered her right to both past and future alimony in the modification agreement. In return, she was to receive the mortgages and promissory note specified in paragraph 2. The mere fact that the consideration furnished by Mr. Olster was mentioned only in the paragraph referring to future alimony does not require us to ignore petitioner's simultaneous forfeiture of alimony arrearages, which constituted an existing enforceable debt.

Petitioner's contention that the individual paragraphs of the modification agreement must stand alone seemingly overlooks the prefatory language of the agreement, which states that the "covenants and conditions" of the agreement are "mutual." We find this case distinguishable from *Davis v. Commissioner*, 41 T.C. 815, 819 (1964), wherein we stated that the various provisions of a modification agreement "*may* be interpreted separately." (Emphasis added.) In *Davis*, certain conditions were placed upon the continued annual payment of specified sums. In separate paragraphs, it was provided that the

husband was to pay lump-sum amounts to the wife by a certain date. The latter paragraphs placed no conditions upon the lump-sum payments. Respondent asserted that the conditions placed upon the annual payments also were intended to apply to the lump-sum payments. We rejected this assertion, holding that the "individual paragraphs of the accord stand alone and are subject to interpretation individually." In *Davis*, our interpretation of the agreement focused on the intentions of the parties. Our conclusion that the conditions did not apply to the lump-sum payments was based upon our divination of such intentions. Similarly, we now must read the minds of petitioner and Mr. Olster.

We find that paragraphs 2 and 3 were integral, that petitioner gave up both past and future alimony rights in return for the consideration furnished by her ex-husband. We believe that the parties entered into the modification agreement as a consequence of Mr. Olster's financial difficulties during the mid–1970s. His payment of both past and future alimony was thrown into significant doubt by his circumstances at that time. Mr. Olster had a definite and fixed obligation to pay alimony which had accrued over several years of nonpayment. He also had an as yet unmatured obligation to pay future alimony into the indefinite future. Petitioner believed that the satisfaction of both obligations was in substantial jeopardy. In entering the agreement, her objective was to get as much as she could under the circumstances. Based on our careful consideration of the evidence presented, we must conclude that the consideration received was intended to satisfy the entirety of Mr. Olster's alimony obligation; that is, all past, present, and future alimony. To hold otherwise would be to defy commonsense by ignoring the realities of the situation, elevating the form of the agreement over its substance.[10] We cannot find an unequivocal basis for

[10]Petitioner's argument that divorced spouses' characterizations of inter-spousal payments are binding upon the Court under the rule of *Commissioner v. Lester*, 366 U.S. 299 (1961), is without merit. *Lester* held that the characterization of payments by the parties as either alimony or support must be respected by the courts when such characterization is specifically spelled out in the governing instrument. The power of the parties to choose the taxable consequences of their acts is authorized by sec. 71(b), whose forerunner was sec. 22(k), I.R.C. 1939. There is no similar authority for the characterization of payments as being either for past or future alimony. *Lester* did not have the effect of eliminating the substance-over-form doctrine in the area of alimony. Thus, the courts are not prohibited

allocating the lump-sum payment between alimony arrearages and future alimony obligations. Because the consideration transferred by Mr. Olster was given in return for petitioner's release of an interwoven mixture of past, present, and future alimony obligations, the payment must be deemed to be in satisfaction of back alimony obligations to the extent thereof.[11]

We next must decide the amount of alimony arrearages that had accrued at the time the modification agreement was entered into by the parties. Respondent contends that Mr. Olster owed petitioner $60,000 in back alimony at such time. This assertion is based upon a sworn statement made by petitioner on December 15, 1978, that the approximate amount of alimony in arrears from her ex-husband from September 1974 through December 1976 was $60,000. While acknowledging that this statement was made, petitioner stated at trial that the affidavit was signed as a favor to her ex-husband for a purpose that was not explained to her. She did not sign it with the awareness that it might have significant income tax impact upon her and therefore did not exercise the care that she otherwise would have exercised had she foreseen the possible consequences of the affidavit. The amount of the alimony arrearages stated in the affidavit was a crude estimate. Petitioner stated that after reviewing her records, she had determined that the true amount of arrearages was $44,800. In order for the back alimony to have reached $60,000 over the 2-year period referred to, Mr. Olster would have had to have paid his ex-wife virtually nothing in alimony. Petitioner stated that Mr. Olster made some payments during this 2-

---

from reexamining the parties' characterizations of payments when determining whether such payments constitute alimony or a property settlement. See *Westbrook v. Commissioner*, 74 T.C. 1357, 1364 (1980); *Mirsky v. Commissioner*, 56 T.C. 664, 674 (1971). Likewise, we are not prohibited from looking behind petitioner's agreement with her ex-husband in order to ascertain the substance of that agreement.

[11]A further factor weighing against petitioner's stance is that Mr. Olster had undergone significantly changed economic circumstances during, and immediately prior to, the year in question. Under Florida law, when the circumstances or financial ability of either party changes, either party may apply to the circuit court for a judgment decreasing or increasing the amount of alimony and the court has jurisdiction to order such change. See Fla. Stat. Ann. sec. 61.14 (West 1982). See also *Purcell v. Purcell*, 223 So. 2d 389 (Fla. 1969). The imminent possibility that Mr. Olster might seek a reduction in his future alimony obligation in such manner greatly impaired the value of such obligation to petitioner. However, the alimony arrearages were fixed and definite and were not similarly subject to being eliminated or reduced.

year period. We found petitioner credible and see no reason to disbelieve her testimony. Therefore, we hold that the total alimony arrearages that had accrued at the time the modification agreement was entered into were $44,800.

The issue of the valuation of the mortgages received by petitioner is somewhat troublesome. The evidence with respect to this issue was not exceptionally organized or clearly presented. Petitioner stated that she did not receive one of the mortgages listed on the mortgage schedule accompanying the modification agreement. We believe petitioner's statement to this effect. Thus, we have determined that petitioner received from her ex-husband mortgages with a face value of $87,243. We must now determine the fair market value of these mortgages.

Three of the mortgages were wraparound mortgages; that is, mortgages that swallowed the original mortgage on the subject property. As we understand the evidence, Mr. Olster financed the original purchase of these three pieces of property by mortgages payable to the sellers of the property. Subsequently, he sold the properties to third parties, who in turn financed their purchases by mortgages payable to Mr. Olster. If payments on the first mortgages ceased, the original sellers would have the right to foreclose on the underlying properties, and by their actions, reduce or negate the obligation of the second buyers (the third parties) to continue paying on the wraparound mortgages. Once the wraparound mortgages were transferred to petitioner, she had full right to receive the moneys paid by the second purchasers. This amount would be received free and clear so long as Mr. Olster continued making payments on the original mortgage. If, however, such payments ceased, petitioner could protect her rights to receive the payments on the second mortgages by making the payments owed by Mr. Olster on the first mortgages. Alternatively, the second purchasers could protect their interests in the properties by making the underlying mortgage payments and offsetting such payments against their own mortgage payments to Mrs. Olster. Thus, in either case, Mrs. Olster would receive only the excess of the payments under the second mortgage over the payments under the first mortgage.

While it is true that Mr. Olster made all payments on the underlying mortgages in question, we believe that the very

real possibility that such payments would cease reduced significantly the value of the wraparound mortgages.[12] Mr. Olster stated that all mortgages transferred were worth about $0.50 on the dollar. He gave no basis for this approximation, and facts were not presented that indicated that he had any expertise in such valuation. Petitioner called a Mr. Pollack, an attorney who specialized in real estate and finance, who stated that the mortgages were worth approximately 40 percent of their face value. Although we believe that Mr. Pollack had a sound familiarity with the real estate area, we do not believe that he was qualified as an expert witness with respect to the valuation of mortgages. Therefore, while his testimony is helpful, it is not deserving of the weight that normally would be accorded to such testimony were he an expert.

Respondent maintains the fair market value of the mortgages transferred was 50 percent of their face value; however, respondent has failed to present any reliable evidence upon which this estimate was based. On the other hand, petitioner has presented evidence indicating that the values of the mortgages were substantially impaired at the time they were transferred. We find that the wraparound mortgages were worth 40 percent of their face value at such time and that the other mortgages were worth 45 percent of their face value at the time of transfer. Therefore, the value transferred in the form of mortgage notes totaled $36,183.24.[13]

Respondent asserts that the fair market value of the promissory note transferred by Mr. Olster to petitioner was $25,000. No basis was presented for this valuation. We find ourselves in significant disagreement with respondent. The note was transferred in 1976 bearing an interest rate of 6

---

[12]This is true whether the mortgages were transferred by Mr. Olster or by one of his marginally solvent corporations.

[13]This total is computed as follows:

| Mortgage | Face value | Discount factor | | Fair market value |
|----------|-----------|-----------------|---|-------------------|
| Eason | $22,827.93 | 0.40 | | $9,131.17 |
| Smith | 11,072.37 | 0.40 | | 4,428.95 |
| Coan | 27,623.62 | 0.40 | | 11,049.45 |
| King | 5,921.35 | 0.45 | | 2,664.61 |
| J. Smith | 9,592.51 | 0.45 | | 4,316.63 |
| Gilmore | 10,205.40 | 0.45 | | 4,592.43 |
| | | | Total | 36,183.24 |

percent. It was payable in full within 1 year from the date of transfer. The note was secured by a mortgage on a parcel of land that was unsuitable for development. The land was encumbered by a $1,500,000 pledge to Walter E. Heller & Co., a first mortgage to Elvida Corp., and a tax lien of approximately $115,000.

At the time of the transfer, petitioner was in dire financial straits. Only the most giddy of optimists would have expected him to make the payment as specified. In fact, Mr. Olster failed to make the note payment when it became due in 1977 and apparently has not made any payments on the note since that time. We believe that the note was virtually worthless when transferred and decline to attribute any value to it. It was an empty promise.

In conclusion, we find that Mr. Olster was $44,800 in arrears in his alimony obligation at the time the modification agreement was entered into. We find that the transfer of properties by Mr. Olster to his ex-wife was in satisfaction of past, present, and future alimony obligations. Payments made for such purposes must be applied initially to the satisfaction of alimony arrearages. Accordingly, the value of property transferred must be applied in such manner and is taxable to petitioner to the extent of the lesser of the fair market value of the property transferred or the amount of alimony arrearages. We have found that the fair market value of the property transferred was $36,183.24. Since this is exceeded by the alimony arrearages, the amount taxable to petitioner is this lesser amount.[14]

Accordingly,

*Decision will be entered under Rule 155.*

---

[14]Petitioner argues that the mortgages are not taxable in the year received since she is a cash basis taxpayer and need not include notes in her income until cash payments are made on the notes. Petitioner has the burden of proving that the mortgage notes did not have a cash equivalent value and are consequently not includable in income during the year of receipt. *Welch v. Helvering,* 290 U.S. 111 (1933). Petitioner called two witnesses who testified that the mortgages had a fair market value of between 40 and 50 percent of their face value. No testimony was elicited to the effect that such fair market value could not be ascertained. The mortgages were the obligations of third parties whose solvency or insolvency was not established. Based on the record, we have determined the fair market values of the mortgages in question. Petitioner has failed to carry her burden of proof in this respect.